### A08A0688. HAUGABOOK v. CRISLER et al.
#### (677 SE2d 355)

ADAMS, Judge.

Richard C. Haugabook filed suit against three brothers primarily alleging money had and received and unjust enrichment arising out of an unusual set of events. The Crisler brothers had hired Paul Farr, a lawyer, to pursue claims arising out of their mother's untimely death, but Farr never filed suit and lied when he told them their case had settled. In a bizarre and perhaps good-hearted attempt to get the fictitious settlement proceeds to the Crislers, Farr then employed an illegal, check-kiting scheme with his law firm's bank accounts, which resulted in an actual wire transfer of $1 million to the Crislers on a Friday. On the following Monday and Tuesday, Farr then defrauded Haugabook, his father-in-law, into lending the same amount to cover the shortage in the firm's bank accounts. When the fraud was discovered, the firm filed a real wrongful death suit on behalf of the Crislers to protect their rights, and Haugabook demanded the Crislers return the money. When they refused, he filed this suit. On cross-motions for summary judgment, the trial court held in favor of the Crislers and ruled that Haugabook's claims against them were legally flawed. Haugabook now appeals.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Assn. of Savannah v. Chatham County*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

The material facts are not in dispute; Haugabook does not contend that the trial court erred with regard to the facts. On December 14, 2004, Ginny Crisler died after she was struck by a hit and run motorist. On January 12, 2005, Scott Crisler employed Paul Farr and his firm — Barnes, Farr and NeSmith — to pursue a wrongful death claim on behalf of the three brothers.[1] Nevertheless, for a period of almost two years Farr did very little to pursue the

---

[1] At all times when dealing with the Crislers, Farr, the firm's managing partner, was acting on behalf of the firm.

claims. He did not fully investigate the case, he did not file suit, and he never settled the case. When dealing with Scott Crisler, however, he concocted a steady stream of lies claiming that the suit was progressing, and he fabricated correspondence, pleadings, and other documents and sent them to the Crislers to support his story. Eventually, Farr told the Crislers that he had been offered policy limits to settle the claim, which the Crislers understood to be $1 million each from two different carriers. Scott Crisler, who had no knowledge of the fraud, accepted the fictitious offer.

Farr and Scott then began to discuss how the settlement proceeds would be wired, and Farr had Scott sign a fake release of the wrongful death claim. At one point, Farr told Scott that he had "screwed up" and had only settled with one carrier for $1 million, and he added a couple of lies to explain how he would settle with the remaining carrier and how no attorney fees would be deducted from the first million. At this point, the Crislers expected to receive a wire transfer of $1 million.

On November 22, 2006, the day before Thanksgiving, Farr began writing checks on the firm's accounts as a vehicle to get one of the banks to fund a $1 million wire transfer to the Crislers. Over the next two days, Farr wrote four $1 million checks payable from one firm account to another.[2] At the time, the firm had four accounts at three banks (two of the accounts were in Sumter Bank — a trust account and a petty cash account), and the four accounts lacked sufficient funds, either alone or combined, to cover a $1 million check. But by confusing the banks with multiple checks and other means, Farr managed to have a wire transfer drawn on a firm account sent to the Crislers by Friday afternoon. Thus, by November 24, the Crislers had received $1 million in the form of a wire transfer to their accounts; it is undisputed that they had full access to the money that afternoon. But at the same time, one of the banks, Citizens Bank of Americus ("Citizens"), was waiting to be paid on two separate $1 million checks from Sumter, one from each account, and neither of those accounts had sufficient funds.

On Monday, November 27, Sumter paid Citizens $1 million from the trust account. Meanwhile, Farr was taking steps to try to prevent the last check (No. 1206 drawn on the Sumter petty cash account) from being dishonored, including calling Sumter to try to get it to agree to cover or delay funding the check. It was on that same day that Farr approached Haugabook, his father-in-law, asking to borrow $1 million because he knew but did not disclose that "[t]here was a

---

[2] The checks were actually for slightly more than $1 million because they included certain fees.

check involved hanging out there that needed to be covered." Farr told Haugabook that he had settled a case, had written firm trust account checks for $1 million to the clients before he had received funds from the insurance company, and that he needed the money to cover the checks. Farr defrauded Haugabook by lying about an imminent payment from the insurance company and other details and by fabricating documents including a letter from the alleged insurance company that stated that $1 million would be received by December 8, 2006. Haugabook also relied on Farr's partners who told him that they were sure that the insurance payment was coming in. Haugabook essentially admits, however, that he did not fully investigate the underlying circumstances to verify Farr's story. Ultimately Haugabook wrote a check that same day payable to Farr for $1 million. In exchange, Farr gave an unsecured promissory note to Haugabook to repay the money plus interest at eight percent, due and payable on December 28, 2006. Haugabook, Farr, and Farr's partners all knew that Farr would deposit the check into a firm account; and he in fact deposited it into the petty cash account at SB&T that day, covering the last of the $1 million checks.

By December 7 or 8, the entire house of cards tumbled. After finding out the real story, one of Farr's partners told the Crislers everything and the firm filed a wrongful death action on their behalf within the statute of limitation. The Crislers, however, declined to return the money. On December 14, Farr was hospitalized and diagnosed as having a bipolar disorder.

Haugabook filed suit against the Crislers asserting claims of money had and received, unjust enrichment, subrogation, constructive trust, and conversion, and Haugabook also sought injunctive relief, punitive damages, and expenses of litigation. At the time of the trial court's ruling, Haugabook had not sued the firm or Farr over the money. On cross-motions for summary judgment, the trial court held that each of Haugabook's claims was legally flawed. It therefore granted summary judgment in favor of the Crislers and denied Haugabook's cross-motion. Haugabook appeals those rulings.

In a detailed 49-page order, the trial court made findings of fact and conclusions of law, including that the money the Crislers received on Friday did not come from Haugabook nor result from any of his actions. Rather, the money was "in essence, the proceeds of a crime." The court also found that the Crislers "received money for which they gave up nothing."

Money Had and Received. The trial court reviewed the relevant case law and determined that "in a money had and received action, the plaintiff must prove that the money at issue was his own and/or was funded by him (or in someway linked to the plaintiff and/or his efforts)." The court added, "In essence, the real question is . . .

whether the Plaintiff is the 'true owner' of the money at issue, i.e., whether the money at issue can be linked to the Plaintiff." The court then determined that the money the Crislers received on Friday was in fact the proceeds of the crime of check-kiting and not linked to Haugabook. Thus, the money came from one of the banks or the law firm, neither of which is a party to the action. The court found that Haugabook's loan to Farr in exchange for a promissory note was a separate event that occurred four days later. The court noted that the law affords Haugabook a remedy against "the person/entity that actually received [his] money."

Haugabook contends that the doctrine of money had and received fits this case. We agree.

> An action for money had and received is founded upon the equitable principle that no one ought unjustly to enrich himself at the expense of another, and is maintainable in all cases where one has received money under such circumstances that in equity and good conscience he ought not to retain it, and ex aequo et bono it belongs to another. [Cits.]

*Jasper School Dist. v. Gormley*, 184 Ga. 756, 758 (193 SE 248) (1937). See also *Decatur Fed. Sav. &c. Assn. v. Gibson*, 268 Ga. 362, 363 (1) (489 SE2d 820) (1997). The phrase "ex aequo et bono" means "in justice and fairness." *Hodges v. Community Loan &c. Corp.*, 234 Ga. 427, 433 (216 SE2d 274) (1975) (Hall, J., concurring), overruled on separate grounds, *Southern Discount Co. of Ga. v. Ector*, 246 Ga. 30 (268 SE2d 621) (1980). See also Black's Law Dictionary 581 (7th ed. 1999) ("According to what is equitable and good. A decision-maker . . . who is authorized to decide *ex aequo et bono* is not bound by legal rules and may instead follow equitable principles."). In an early case before the Supreme Court of Georgia addressing a claim of money had and received, the court quoted common law for these principles:

> "If the defendant be under *an obligation,* from the ties of *natural justice,* to refund, the law implies a *debt,* and gives this action, founded in the *equity of the plaintiff's case,* as if it were upon contract."

And,

> "One great benefit derived to a suitor from the nature of this action is, that he need not state the special circumstances from which he concludes that, *ex aequo et bono, the money received by the defendant ought to be deemed belonging to him.*"

(Emphasis in original.) *Culbreath v. Culbreath*, 7 Ga. 64, 68 (1849).[3]

The undisputed facts of this case show that Farr defrauded the banks and the firm and that the Crislers received the proceeds of the crime. Farr then defrauded his father-in-law in order to protect himself and his firm from liability to the banks. The firm and the banks received the proceeds of that fraud, and, as a consequence, neither is out any money. Although Farr misled the Crislers about their wrongful death suit, they ultimately received $1 million to which they were not entitled. Their wrongful death suit has since been filed and is being prosecuted, and Scott Crisler admitted in his deposition that the Crislers had not given up anything for the $1 million.[4] In short, Haugabook has presented facts to show that the defendants have been unjustly enriched and that Haugabook is "in justice and fairness" the true owner of the $1 million.

The Crislers strongly urge that the trial court was correct because the law requires that the plaintiff show that the defendant is literally in possession of the plaintiff's money or that the plaintiff conferred a benefit on the defendant. But, the true requirement is that the plaintiff show that he is in equity and good conscience entitled to the money:

> "In order to maintain an action for money had and received it is necessary to establish that defendants have received money belonging to the plaintiff *or* to which he is in equity and good conscience entitled." 2 Elliott on Contracts, 623, § 1375.

(Emphasis supplied.) *Cutright v. Nat. Union Fire Ins. Co.*, 65 Ga. App. 173, 177 (15 SE2d 540) (1941). Furthermore, "[i]t is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner." (Citations and punctuation omitted.) *Fain v. Neal*, 97 Ga. App. 497, 499 (103 SE2d 437) (1958).

In an early case, a plaintiff was allowed to proceed with a claim even though the defendant was not literally in possession of the plaintiff's money. See *O'Neal v. Deese*, 23 Ga. 477 (1857). In that case, a man named Yopp sent five bales of cotton to the railroad

---

[3] "Although legal in form, being an action in implied assumpsit, [an action for money had and received] is founded on the equitable principle that no one ought to unjustly enrich himself at the expense of another, and it is a substitute for a suit in equity." *J. C. Penney Co. v. West*, 140 Ga. App. 110, 111-112 (2) (230 SE2d 66) (1976).

[4] That the Crislers may have had "an undiscovered malpractice claim against Farr and the Firm" at the time they received the money cannot be construed to mean that they gave up value in exchange for the $1 million.

station with instruction that they be shipped to a cotton broker. When rain washed away the identification on the bales, they were mistakenly marked as belonging to O'Neal and sent to the same broker along with O'Neal's bales. O'Neal collected the total payment when the broker sold the cotton. Yopp called upon the railroad to account and the railroad paid him the value of the five bales. The railroad then recovered the money from its own station agent, Joel Deese, whose mistake had caused the loss. Despite the fact that Deese did not pay out any money until sometime after O'Neal wrongfully came into possession of Yopp's money, the Supreme Court held that Deese was able to proceed against O'Neal with a claim of money had and received. Id. Indeed, the court noted that O'Neal needed to explain "why he apparently holds on to money which does not belong to him, and which an innocent man has had to pay to the rightful owner." Id. at 479.

Nothing in the discussion in that case suggests that Deese's claim for money had and received was dependent on the fact that Deese's initial mistake triggered the erroneous payment. *O'Neal*, 23 Ga. at 479-480. And, accordingly, we do not believe that the result would have been different if someone else had caused the mistake and Deese had somehow been forced to pay for it. Nor do we find any difference in the equities of the two scenarios. The proper plaintiff in a claim of money had and received is not the person who by mistake set in motion a series of events that ultimately unjustly enriched the defendant; it is the person who in justice and fairness is entitled to the money.

It is true that the cases cited by the Crislers sometimes use terminology suggesting that the plaintiff in a case of money had and received must show that the money was his own. But each of the cases is distinguishable on its facts, and each decision can be justified based on the above-quoted principles of money had and received. In *Intl. Indem. Co. v. Bakco Acceptance*, 172 Ga. App. 28 (322 SE2d 78) (1984), the plaintiff's money was stolen, and it never ended up in anybody's hands who was a party to the action, let alone the defendants. Therefore, the defendants in that case had not been unjustly enriched. Id. at 32. See also *Gibson*, 268 Ga. at 363 (1) (claim not properly characterized as an action for money had and received where defendant received no money). In *Eastside Carpet Mills v. Dodd*, 144 Ga. App. 580 (241 SE2d 466) (1978), the court cited *Cohen v. Garland*, 119 Ga. App. 333 (2) (167 SE2d 599) (1969), for the proposition that " '(w)hen one sues for money had and received for his use, he must prove that the money was his own.' " *Dodd*, 144 Ga. App. at 581. Yet the court decided *Dodd* on the reasoning that the defendant was not unjustly enriched because it had received only what it was entitled to as a part of a separate business transaction.

Id. And in *Cohen*, 119 Ga. App. 335 (2), the plaintiff's claim was denied because he was not out any money at all; he had attempted to bring a claim for money had and received for funds that his father had paid to the defendant. Id. In *J. C. Penney Co. v. West*, 140 Ga. App. 110, 112 (230 SE2d 66) (1976), an issue was raised as to whether the plaintiff was the "true owner" of the funds that had unjustly enriched the defendant. But the issue only arose because it was unclear whether a related but different entity was the party who ex aequo et bono was entitled to some of the money. Id. at 112 (3). The question was whether the plaintiff was the real party in interest for all of the money; not whether the plaintiff had the right kind of proprietary interest in the money. Id. Finally, in *Estes v. Thompson*, 90 Ga. 698, 700 (17 SE 98) (1892), the plaintiff was not out any money that was related to money received by the defendant.

Although there may be issues of fact in this case regarding whether the firm should have known about Farr's actions and whether the banks should have been able to stop the kite, these issues are not relevant to Haugabook's claim for money had and received.[5] With regard to his own failure to fully investigate the facts and circumstances when Farr defrauded him into lending $1 million, Haugabook's negligence could prevent relief in equity in some cases. See OCGA § 23-2-32 (a). But the Georgia Code specifically provides an exception in that "[r]elief may be granted even in cases of negligence by the complainant if it appears that the other party has not been prejudiced thereby." OCGA § 23-2-32 (b). That rule is "subject to a weighing of the equities between the parties by the trier of fact." *Gulf Life Ins. Co. v. Folsom*, 256 Ga. 400, 406 (349 SE2d 368) (1986). As shown above, the Crislers have not been prejudiced by Haugabook's alleged negligence. Accordingly, the Crislers have no defense on this ground. See also *Bill Heard Chevrolet Co. v. Atlantic Discount Co.*, 120 Ga. App. 388, 389 (170 SE2d 740) (1969) (plaintiff's negligence did not defeat action for money had and received where it did not violate a positive legal duty owed to the defendant).

For all of the above reasons, we hold that the trial court erred by granting summary judgment in favor of the Crislers on the claim of money had and received.

With regard to Haugabook's motion for summary judgment, we must construe the facts in favor of the Crislers and consider their defenses to the action. Without repeating them, we find all material facts to be undisputed and supportive of Haugabook's claim. With regard to the defenses, the Crislers may defend themselves by

---

[5] Farr's partners had access to the firm's computer accounts, including Farr's client files, which possibly could have led them to discover the fraud earlier.

showing "every thing which shows that the plaintiff, *ex aequo et bono,* is not entitled to the whole of his demand, or to any part of it." (Punctuation omitted.) *Culbreath*, 7 Ga. at 68. Although the Crislers were also the victims of Farr's fraud, they have not shown any equitable considerations regarding why Haugabook should not be entitled to the money. Accordingly, the trial court also erred by failing to grant summary judgment in favor of Haugabook on the claim of money had and received. See, e.g., *Bill Heard Chevrolet*, 120 Ga. App. at 389 (summary judgment properly granted in favor of plaintiff on claim of money had and received); *Gulf Life*, 256 Ga. at 404 (summary judgment proper when indisputable facts clearly establish liability). We reverse and remand for entry of an order awarding summary judgment in favor of Haugabook on this claim.

Because Haugabook is entitled to judgment on this claim, we need not address the merits of his other legal and equitable claims to the same money. Finally, Haugabook did not argue that the trial court erred by entering summary judgment on his claim for punitive damages, and therefore that aspect of the trial court's order stands.

*Judgment affirmed in part and reversed in part, and case remanded with direction. Smith, P. J., and Mikell, J., concur.*

DECIDED MARCH 26, 2009 —
RECONSIDERATION DENIED APRIL 10, 2009 ▉▉▉▉▉▉▉

*Jones, Cork & Miller, H. Jerome Strickland, Christopher B. Jarrard*, for appellant.

*Fortson, Bentley & Griffin, J. Edward Allen, Jr., Jeffrey W. DeLoach, Davis & Melton, F. Gregory Melton*, for appellees.