**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY, and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**June 30, 2015**

# In the Court of Appeals of Georgia

A15A0306. VERNON v. ASSURANCE FORENSIC ACCOUNTING, LLC.

A15A0307. ASSURANCE FORENSIC ACCOUNTING, LLC. v. VERNON.

BARNES, Presiding Judge.

These companion appeals arise out of a dispute over severance pay. Mark Vernon sued his former employer, Assurance Forensic Accounting, LLC, ("Assurance" or the "company") for breach of contract and other claims, seeking unpaid commissions allegedly owed under a severance agreement. Following discovery, the trial court granted Assurance's motion for summary judgment on Vernon's claims for breach of contract, money had and received, fraud, violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"), and equitable accounting. Vernon appeals these rulings in Case No. A15A0306. The trial court denied Assurance's motion for summary judgment on Vernon's claims for

promissory estoppel and unjust enrichment, and Assurance cross-appeals these rulings in Case No. A15A0307.

For the reasons discussed below, in Case No. A15A0306, we reverse the trial court's grant of summary judgment to Assurance on Vernon's claim for breach of contract. We affirm the trial court's grant of summary judgment to Assurance on Vernon's claims for money had and received, fraud, violations of Georgia RICO, and equitable accounting.[1] In Case No. A15A0307, we affirm the trial court's denial of summary judgment to Assurance on Vernon's claims for promissory estoppel and unjust enrichment.

Summary judgment is proper only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." OCGA § 9-11-56 (c). On appeal from a trial court's grant or denial of summary judgment, we "conduct a de novo review, construing all reasonable inferences in the light most favorable to the nonmoving party." *Bank of North Ga. v. Windermere Dev.*, 316 Ga. App. 33, 34 (728 SE2d 714) (2012). So viewed, the record shows as follows.

---

[1] Assurance's motion to strike Vernon's reply brief in Case No. A15A0306 is hereby denied.

2

*The Original Compensation Agreement.* Assurance is a certified public accounting firm that specializes in forensic accounting. Dennis Neas and Chad Thompson formed Assurance as a limited liability company and are the sole members and managers of the company. Neas and Thompson were authorized to act on behalf of Assurance.

Vernon, a childhood friend of Neas, began working for Assurance as a salesperson shortly after its formation in 2004. Neas and Thompson reached an oral agreement with Vernon that in return for his sales and marketing work for Assurance, he would be paid a commission of 5 percent of Assurance's revenue received from approximately 20 specified clients[2] and 15 percent of the revenue received from all other clients (the "Original Compensation Agreement" or the "5/15 percent rate"). Although Vernon was entitled to commission at the 5/15 percent rate under the Original Compensation Agreement, he was hired on an "at-will" basis and thus could be terminated at any time.

*The Amended Compensation Agreement.* Vernon worked under the Original Compensation Agreement for approximately two years. However, in late 2005, as

---

[2] The 20 specified clients were existing clients of Neas and Thompson that continued doing business with them after they left their former accounting firm to form Assurance.

Assurance grew more successful, Neas and Thompson informed Vernon that they wanted to renegotiate the Original Compensation Agreement to lower Vernon's commission rate. In response, Vernon went "on strike" and did not work for several months. In the spring of 2006, Vernon returned to work with the understanding that they "were going to be able to work something out," and the parties thereafter orally agreed to a revised compensation agreement (the "Amended Compensation Agreement").

The Amended Compensation Agreement was never reduced to writing, and the parties dispute its terms. According to Neas and Thompson, the parties agreed that Vernon would continue to be paid commission under the 5/15 percent rate on revenue actually received from clients until Assurance reached annual revenue over $3,000,000. Neas and Thompson asserted that the parties further agreed that once Assurance reached annual revenue over $3,000,000, the 5/15 percent rate would no longer apply, and Vernon's rate of commission would be subject to Assurance's discretion until the parties agreed on a new compensation agreement. Neas and Thompson claimed that the parties further agreed that in the event they could not reach a new agreement on compensation once annual revenue exceeded $3,000,000, Vernon would receive severance payments for 12 months under the "current

4

compensation structure," meaning that his severance pay would be calculated under the 5/15 percent rate on revenue actually received from clients only up to the point when the company reached $3,000,000 in annual revenue, after which the severance pay rate would be subject to Assurance's discretion.

In contrast, Vernon testified that under the Amended Compensation Agreement, the parties agreed that he would continue to be paid commission under the existing 5/15 percent rate until his annual income reached $450,000 (i.e., 15 percent of $3,000,000) and he earned more than anyone else who worked on behalf of the company, whereupon his compensation would be renegotiated. Vernon also maintained that the parties agreed that if he was ever terminated for any reason, including a disagreement regarding his compensation, he "would receive a severance from Assurance . . . at [his] current commission rate on all jobs received prior to and during the severance period of twelve months from the date of termination." According to Vernon, "it would be self-evident to anybody familiar with the industry" when a job assignment was "received" by an accounting firm. Specifically, Vernon maintained, it was understood that a job was "received" by Assurance when the assignment was entered into Assurance's business database or when Assurance otherwise acknowledged its receipt of the assignment through a communication with

5

the client. Vernon also asserted that the parties agreed that his severance pay would be set at the 5/15 percent rate irrespective of Assurance's annual revenue.

*The Sales Commission Proposal.* In June 2010, Vernon helped Assurance procure a significant amount of forensic accounting work in connection with the British Petroleum ("BP") oil spill in the Gulf of Mexico. Assurance's revenue grew to over $3,000,000 in 2010 as its work on the BP project increased, and Vernon was paid $460,532 in commissions.[3] However, Vernon did not earn as much as Thompson.

In early 2011, Thompson began developing a proposal for a new compensation structure for Vernon. On April 14, 2011, Neas emailed Vernon a proposal developed by Thompson that sought to change Vernon's 5/15 percent rate of commission (the "Sales Commission Proposal"). The Sales Commission Proposal also included a section entitled "Termination" that stated in relevant part: "If this proposal is rejected, then [Vernon] will continue to be paid at the 15% rate for one year, as previously agreed. If during this one year period, another compensation plan is accepted, that plan will be implemented retroactively to the date . . . of this proposal. "

---

[3] Ultimately, Assurance received approximately $10,000,000 for its work on the BP project from June 2010 until June 2012.

On April 20, 2011, Thompson emailed Vernon, noting that "[a]s indicated in our conversation this morning," discussions regarding the Sales Commission Proposal would be deferred for one month. Thompson then wrote, "We will not charge this time to your 1 year severance agreement."

On May 22, 2011, Vernon sent an email to Thompson to which he attached a lengthy letter rejecting the rate structure set forth in the Sales Commission Proposal and explaining his reasons for the rejection. Vernon copied Neas on the email with the attached letter. In the letter, Vernon wrote, "Let me make myself perfectly clear about these negotiations. I will not accept a change in any of our agreements as long as I am not earning as much as you are earning from Assurance[.] I have been just as instrumental as you have towards this company's success."

Vernon also discussed in his May 22 letter the "history" of the parties' negotiations over pay and noted that, "After a great deal of deliberation by the three of us, we came to an agreement that we would renegotiate my compensation if my commissions exceeded the amount of money that you could make from the company" and had "agreed to allow me the opportunity to make at least 15% on the first 3MM in revenue per year." Vernon further wrote that the parties had agreed that if Neas and Thompson "ever wanted to change [his] compensation, and if [he] chose not to accept

7

the new terms," he would be entitled to severance pay from Assurance at his "current commission rate on all jobs received prior to and during the severance period of 12 months from the date of termination."

Later that day, Neas sent an email to Vernon that terminated his employment with Assurance. Neas wrote that he was "sorry things cannot be worked out" but that "we intend to honor our agreement of 1 year severance, starting today." Thompson sent a similar email to Vernon that same day stating that "[s]ince we are unable to reach an agreement, we will start the one year payment cycle we agreed to."

*The Severance Payments.* Assurance had exceeded $3,000,000 million in annual revenue for 2011 by the time that Vernon ceased working at the company on May 11. Vernon's first severance payment, May 27, 2011, was paid at the 5/15 percentage rate for commissions. However, beginning with Vernon's second severance payment on June 16, 2011, Assurance, without telling Vernon, stopped paying him at the 5/15 percent rate and began paying Vernon commission at lower rates. Neas and Thompson testified that they exercised their discretion to decide on the rates they would pay Vernon during the severance period. Exercising their discretion, Neas and Thompson gradually decreased the amount of Vernon's severance pay from $54,957 in his first check on May 27, 2011, to $13,422 in his last

8

check paid on April 27, 2012. Neas and Thompson paid no severance to Vernon in May 2012.

On June 17, 2011, Vernon sent an email to Neas requesting that "supporting documents" be provided with the severance checks mailed to him, but Neas did not provide the requested documentation. Instead, according to Vernon, Neas and Thompson embarked on a fraudulent scheme to mislead him regarding the amount of work Assurance was receiving as part of the BP oil project and the manner in which his severance pay was being calculated. In this regard, Vernon points to emails sent to him from Neas and Thompson suggesting that Assurance's work on the BP oil project was winding down when in fact it was not. Vernon also asserts, among other things, that Neas and Thompson used "odd amounts [in his severance checks] to make it appear as if the payments were calculated using a formula rather than simply being made up."

Vernon emailed Neas on June 14, 2012, writing that "it is time to start putting together a full accounting of what you and [Thompson] have paid me since my severance started on May 22, 2011" and reminding Neas that his severance pay was to include commission on revenues from any job that had been received by Assurance through the last day of the severance period. On June 20, 2012, Neas responded to

9

Vernon's request by email: "We were hoping you were happy with the severance we gave you since it greatly exceeded any of your prior annual earnings. With that said, we have completed paying your severance and do not believe you are entitled to an accounting."

*The Litigation.* In 2013, Vernon sued Assurance for breach of contract, contending that the company had failed to pay him severance at the 5/15 percent rate on all jobs received prior to and during the severance period of twelve months from May 22, 2011. Vernon also asserted claims for promissory estoppel, unjust enrichment, money had and received, fraud, and violation of the Georgia RICO statute, OCGA § 16- 14-1 et seq. In addition to compensatory damages, Vernon sought an equitable accounting, attorney fees, and punitive damages.

Assurance answered, denying liability, and asserted a counterclaim for declaratory judgment, seeking a determination as to the enforceability and terms of the Amended Compensation Agreement. If the Amended Compensation Agreement was determined to be valid and enforceable, Assurance asked the trial court to decree that Vernon was owed nothing under its terms. If the Amended Compensation Agreement was determined to be unenforceable under the Statute of Frauds or for any other reason, Assurance asked the trial court to order that Vernon repay all or a

portion of the severance paid to him under the legal theories of money had and received and unjust enrichment. Assurance also sought attorney fees.

Following discovery, Assurance moved for summary judgment on Vernon's claims.[4] After conducting a hearing, the trial court granted Assurance's motion for summary judgment as to Vernon's claims for breach of contract, money had and received, fraud, Georgia RICO, and equitable accounting. The trial court denied Assurance's motion as to Vernon's claims for promissory estoppel and unjust enrichment.

*Case No. A15A0306*

1. Vernon alleged that Assurance breached the parties' agreement to pay him severance. The trial court granted summary judgment to Assurance on Vernon's breach of contract claim on the ground that any agreement as to severance pay made as part of the Amended Compensation Agreement was "simply too vague to be enforceable" because the parties never agreed on the material term of how to calculate

---

[4] Vernon filed a motion for partial summary judgment on his claim for breach of contract, promissory estoppel, and money had and received, as well as on Assurance's counterclaim. The trial court denied Vernon's motion for partial summary judgment, but Vernon has not challenged that ruling on appeal. Hence, Vernon has waived any objection he may have had to the trial court's denial of his motion for partial summary judgment. See *C. P. D. Chemical Co. v. Nat. Car Rental Systems*, 148 Ga. App. 756, 759 (3) (252 SE2d 665) (1979).

the severance. On appeal, Vernon contends that the evidence, construed in his favor as the non-moving party, showed that the parties agreed to sufficiently specific terms regarding the payment of severance to render the agreement enforceable. We agree.

> For . . . a contract to be enforceable, the parties must agree on all material terms, and those terms cannot be incomplete, vague, uncertain or indefinite. In considering whether a contract is unenforceable, however, a trial court must bear in mind that the law leans against the destruction of contracts on the ground of uncertainty, and the uncertainty and indefiniteness at issue must be extreme to warrant the conclusion that a contract cannot be enforced. It is unnecessary that a contract state definitively and specifically all facts in detail to which the parties may be agreeing, but as to such matters, it will be sufficiently definite and certain if it contains matters which will enable the courts, under proper rules of construction, to ascertain the terms and conditions on which the parties intended to bind themselves.

(Punctuation and footnotes omitted.) *Triple Eagle Assoc. v. PBK, Inc.*, 307 Ga. App. 17, 19-20 (2) (704 SE2d 189) (2010).

As previously discussed, Vernon testified in his deposition, and presented documentary evidence in the form of his May 22, 2011 letter, that as part of the Amended Compensation Agreement, the parties had agreed that if Assurance terminated him for any reason, including a disagreement over compensation, he

"would receive a severance from Assurance . . . at [his] current compensation rate on all jobs received prior to and during the severance period of twelve months from the date of termination." Vernon further testified that everyone would have understood, based on industry practice, that a job was "received" by Assurance when the assignment was entered into Assurance's business database or when Assurance otherwise acknowledged its receipt of the assignment through a communication with the client.[5] Lastly, Vernon testified that the parties agreed that his severance pay would be set at the current 5/15 percent rate regardless of Assurance's annual revenue.

Vernon's testimony was sufficient to establish the terms of an agreement on severance reached by the parties. See *Thompson v. Floyd*, 310 Ga. App. 674, 681 (2) (713 SE2d 883) (2011) (contract "may be enforceable even though it rests only in words as remembered by the witnesses") (citation and punctuation omitted). Furthermore, Neas and Thompson never disputed Vernon's interpretation of the parties' severance agreement found in his May 22, 2011 letter, and "where a letter

---

[5] In his deposition, Thompson confirmed that Assurance has records that show the date when a job assignment was entered into its database. Thompson further confirmed that when a client sends Assurance an assignment, Assurance provides the client a written acknowledgment outlining the planned work.

13

from one party to a contract to the other party showed that the writer placed a different construction on a contract than did the other party, the latter's silence was acquiescence in such construction." (Punctuation omitted.) *Jerkins v. Jerkins*, 300 Ga. App. 703, 706-707 (2) (686 SE2d 324) (2009), quoting *Salvatori Corp. v. Rubin*, 159 Ga. App. 369, 373 (3) (283 SE2d 326) (1981). Moreover, Neas and Thompson both affirmed by email Assurance's obligation to pay severance, and both averred in their affidavits that an oral agreement on severance had been reached. Neas testified in his deposition that "we had an agreement that we would pay [Vernon] the one year severance," and Thompson testified that the parties "thought we had a handshake deal."[6]

Given this combined evidence, we conclude that a jury would be entitled to find that the parties had mutually assented to the payment of severance under the terms as detailed by Vernon, and that those terms were sufficiently definite to be

---

[6] There was other testimony from Thompson during his deposition that a final agreement on severance had never been reached and that it remained simply a "concept" that needed to be further "ironed out." But, of course, in the context of a motion for summary judgment, we must construe any conflicts in the evidence in favor of the non-moving party, Vernon. See generally *Spivey v. Bd. of Ed. of Savannah*, 194 Ga. App. 726 (391 SE2d 783) (1990) (noting that on summary judgment, "all doubts and conflicts in the evidence" must be resolving in favor of the non-moving party).

14

enforceable by a court. While Neas and Thompson averred in their respective affidavits that the parties reached an agreement on severance pay containing different terms than those described by Vernon, "[t]he fact that the plaintiff and the defendant differed in their testimony as to the terms of the contract is not sufficient to show that their minds had never met, but simply raised a conflict in the evidence as to what was the contract between the parties." (Citation and punctuation omitted.) *Lofty v. Fuller*, 223 Ga. App. 95, 96 (1) (477 SE2d 30) (1996). The trial court therefore erred in granting summary judgment to Assurance on the ground that the severance pay provision was too vague to be enforceable.

Assurance emphasizes, however, that there was evidence that Neas, Thompson, and Vernon contemplated that any agreement reached by them ultimately would be reduced to writing and signed by the parties.

> While circumstances indicating that the parties intended to prepare a subsequent writing is strong evidence that they did not intend to be bound by a preliminary agreement, contrary evidence bearing upon the parties' intent to be bound and reflecting the existence of a binding oral agreement presents a question of fact for the jury's determination.

*Turner Broad. System v. McDavid*, 303 Ga. App. 593, 601 (1) (a) (iii) (693 SE2d 873) (2010). See also *Doss & Assoc. v. First American Title Ins. Co.*, 325 Ga. App. 448,

15

452 (1) (754 SE2d 85) (2013) ("[A] formal, written agreement may be a condition precedent to the formation of a binding contract, when the parties so intend. When the parties intend to memorialize with a formal document an agreement that they have already reached, on the other hand, the execution of the document is not an act necessary to the creation of an enforceable contract.") Here, there was evidence, including the affidavits of Neas and Thompson and Vernon's testimony and correspondence already discussed, which reflected that the parties intended to reach a binding oral agreement that would later be memorialized in a formal document. Under these circumstances, the fact that the oral agreement ultimately was not reduced to writing did not render it unenforceable as a matter of law.

Assurance also emphasizes that Vernon testified that the parties never specifically discussed whether he would be paid severance if he decided to quit or was fired for cause or convicted of a felony. "However, the parties need only agree to the essential terms of the contract, and the absence of agreement on nonessential terms does not render the agreement unenforceable." *Rushin v. Ussery*, 298 Ga. App. 830, 834 (2) (681 SE2d 263) (2009). There was evidence that the parties agreed that if Assurance terminated Vernon for any reason, including a disagreement over his compensation, he would receive severance pay, the condition which occurred here

16

and gave rise to this action. Accordingly, there was evidence that the parties reached agreement on the essential term of when severance pay would be triggered, which was sufficient to render the agreement enforceable, even if other details or scenarios were not contemplated or discussed. See id.

In addition, Assurance argues that there were inconsistencies in Vernon's testimony regarding the terms of his severance pay that rendered the agreement unenforceable in light of *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27 (343 SE2d 680) (1986).

> *Prophecy Corp.* stands for the proposition that self-contradictory testimony is construed against the equivocator, absent a reasonable explanation for the contradiction. However, the opposing party is entitled to judgment only where the favorable portion of the party's self-contradictory testimony is the *only* evidence of his right to recover or of his defense.

(Citations and punctuation omitted; emphasis in original.) *Rushin*, 298 Ga. App. at 833 (1). Pretermitting whether Vernon's testimony contained any material contradictions, we note that there was other evidence supporting his version of the severance pay agreement, namely, his May 22, 2011 letter containing his interpretation of the agreement to which Neas and Thompson failed to respond. Under

17

this circumstance, any alleged inconsistencies in Vernon's testimony did not destroy the contract on the basis of uncertainty for purposes of summary judgment, but instead can be considered by a jury in assessing Vernon's credibility when it resolves at trial what constituted the terms of the severance pay agreement reached by the parties. See *Sanders v. Commercial Cas. Ins. Co.*, 226 Ga. App. 119, 121 (1) (485 SE2d 264) (1997).[7]

Lastly, Assurance argues that even if the trial court erred in concluding that the agreement on severance pay was too vague to be enforceable, the trial court should be affirmed under the "right for any reason" rule because the version of the agreement to which Vernon testified was unenforceable under the Statute of Frauds. See *Dan J.*

[7]Over several pages of its appellee's brief, Assurance argues that any agreement reached by the parties on severance pay is unenforceable because Vernon testified that the Amended Compensation Agreement also contained a separate equity provision addressing Vernon's right to a portion of the proceeds generated if Neas or Thompson sold their ownership interests in Assurance, and that provision is too vague to be enforceable. But Vernon does not seek to enforce the equity provision, and the provision is not at issue in this case in any respect, given that it is undisputed that neither Neas nor Thompson have ever attempted to sell their interest in Assurance. Furthermore, pretermitting whether the equity provision was too vague to be enforceable, there was evidence, as previously discussed, from which a jury could find that the parties intended to enter into a binding, final agreement on the matter of severance pay. See *Jorgensen v. Alsop*, 240 Ga. App. 565, 566 (1) (524 SE2d 272) (1999) (settlement agreement resolving all issues except the question of a restraining order was enforceable because it "was intended by both parties to be a final disposition of all other matters").

18

*Sheehan Co. v. Fairlawn on Jones Homeowners' Assn.*, 312 Ga. App. 787, 790 (1), n. 11 (720 SE2d 259) (2011) ("A grant of summary judgment must be affirmed if right for any reason[.]") (citation and punctuation omitted). Specifically, Assurance argues that the severance pay provision was an "agreement that is not to be performed within one year from the making thereof" under OCGA § 13-5-30 (5) and thus was barred by the Statute of Frauds unless it was reduced to writing and signed by Assurance. We are unpersuaded.

It is true that agreements that cannot be performed within one year from their making must be in writing. *Ikemiya v. Shibamoto America*, 213 Ga. App. 271, 272 (1) (444 SE2d 351) (1994). But "[t]o fall within the ambit of this statutory provision, a contract must be *incapable* of being performed within a year; the possibility of performance of the contract within one year is sufficient to remove it from the Statute of Frauds." (Footnote and punctuation omitted; emphasis supplied.) *Bithoney v. Fulton-DeKalb Hosp. Auth.*, 313 Ga. App. 335, 341 (1) (721 SE2d 577) (2011). See *Henry v. Blankenship*, 275 Ga. App. 658, 661 (1) (a) (621 SE2d 601) (2005) ("[I]f the promise may possibly be performed within a year, it does not fall within this provision.").

> A promise which is not likely to be performed within a year, and which in fact is not performed within a year, is not within the statute if at the time the contract is made there is a possibility in law and in fact that full performance such as the parties intended may be completed before the expiration of a year. . . . Illustrations of the lengths to which courts will go to avoid the strictures of the statute under these or similar circumstances are abundant.

9 Williston on Contracts § 24:3 (4th ed.)

It is undisputed that the Amended Compensation Agreement immediately went into effect when agreed to by the parties. And according to Vernon, the parties agreed that the agreement on severance pay made as part of the Amended Compensation Agreement would go into effect if he was terminated because of a disagreement over compensation or for some other reason. Although unlikely, it is possible that Assurance could have terminated Vernon the same day the parties entered into the Amended Compensation Agreement, triggering the severance pay obligation. Furthermore, it is possible that the revenue earned on jobs received prior to and during the one-year severance period could have been paid to Assurance by its clients, and a portion of that revenue then distributed to Vernon, within the one-year severance period. Consequently, the parties' contract was capable of being performed within one year of its making, and thus was not subject to the Statute of Frauds. See

20

*Bell Bros. v. Aiken*, 1 Ga. App. 36, 37 (1) (57 SE 1001) (1907) (where employee orally agreed to compensate salesperson for the period of one year, beginning on the same day that the compensation agreement was reached, agreement did not fall within the Statute of Frauds). See also Williston, supra, § 24:12 ("If a contract . . . is for the term of a year beginning on the day of the contract, there is no doubt that the statute is inapplicable and the contract may be oral.").

Assurance relies on *Morgan v. American Ins. Managers*, 239 Ga. App. 635, 636-637 (1) (521 SE2d 676) (1999), to support its argument under the Statute of Frauds, but that case is distinguishable. In *Morgan*, the parties verbally agreed to a "twelve-month rolling agreement" under which Morgan would start work on a future date and would be entitled to twelve additional months of employment for each day he showed up for work. Id. Morgan testified that by its terms, the rolling agreement "could, at its minimum duration, be performed in a year and a day." Id. at 637 (1). We agreed and concluded that the employment agreement was unenforceable under the Statute of Frauds. Id.

*Morgan* is consistent with the well-established rule that "a verbal contract for services to begin in the future and continue for a year is void under the Statute of Frauds." (Emphasis supplied.) *Katz v. Custom Spray Products*, 168 Ga. App. 451, 452

21

(309 SE2d 663) (1983). In contrast, as previously discussed, performance of the contract in the present case could have commenced on the same day that the agreement was reached and have been completed within one year, taking the contract outside the ambit of the Statute of Frauds. See *Bell Bros.*, 1 Ga. App. at 37 (1).

Under these circumstances, we conclude that the trial court erred in granting summary judgment to Assurance on Vernon's breach of contract claim. A jury must decide whether Assurance and Vernon mutually assented to the payment of severance under the terms as detailed by Vernon, and the oral agreement alleged by Vernon was not unenforceable under the Statute of Frauds.

2. Vernon next contends that the trial court erred in granting summary judgment to Assurance on his claim for money had and received. We disagree.

"An action for money had and received is founded upon the equitable principle that no one ought to unjustly enrich himself at the expense of another, and is maintainable in all cases where one has received money under such circumstances that in equity and good conscience he ought not to retain it." (Citation and punctuation omitted.) *Sentinel Offender Svcs., LLC v. Glover*, 296 Ga. 315, 331 (4)

(a) (766 SE2d 456) (2014). See *Haugabook v. Crisler*, 297 Ga. App. 428, 431 (677 SE2d 355) (2009).[8]

> If the defendant be under an obligation, from the ties of natural justice, to refund, the law implies a debt, and gives the action, founded in the equity of the plaintiff's case, as it were upon a contract ("quasi ex contractu") as the Roman law expresses it. This kind of equitable action to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which, ex aequo et bono, the defendant ought to refund. In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money. And in such an action it is immaterial how the money may have come into the defendant's hands, if, in equity and good conscience, he is not entitled to hold it against the true owner.

(Citations and punctuation omitted.) *Laurens County v. Gay*, 117 Ga. App. 793, 795 (3) (161 SE2d 906) (1968).

In *William N. Robbins, P.C. v. Burns*, 227 Ga. App. 262, 263-264 (488 SE2d 760) (1997), a law firm sued its former associate for breach of an employment

---

[8] A claim for money had and received "exists only where there is no actual legal contract governing the issue." (Citation and punctuation omitted.) *Fernandez v. WebSingularity*, 299 Ga. App. 11, 13-14 (2) (681 SE2d 717) (2009). Because the existence of a binding contract is a jury question in this case, Vernon could assert an alternative claim for money had and received, so long as he could otherwise make out the elements of such a claim. See id. at 13-15 (2).

agreement that provided that if the associate resigned from the firm and any of the firm's clients continued to have the associate represent them, the law firm would be entitled to a percentage of the attorney fees paid by those clients to the associate. The law firm also asserted a claim for money had and received based on the associate's failure to pay it a portion of those attorney fees. Id. at 265 (2). We affirmed the trial court's grant of summary judgment to the associate on the law firm's claim for money had and received, reasoning that

> [the associate] was not paid money which should have been paid to the [law] firm. Although [the associate] may well be indebted to the [law] firm for various aspects of file origination, [the associate] does not owe [the law firm] a refund. In other words, the [law] firm was not the "true owner" of the money which the clients paid [the associate]. Accordingly, the court properly granted summary judgment on this claim.

Id.

We reach the same conclusion under the facts of this case. As in *William N. Robbins, P.C.*, the dispute here is simply over a payment arrangement between the parties. It is undisputed that the clients always paid Assurance and that Vernon was never entitled to receive money directly from those clients. While Assurance may be indebted to Vernon for failing to comply with the party's payment arrangement,

24

Assurance does not owe Vernon a "refund," and Vernon is not the "true owner" of the money that the clients paid Assurance. Consequently, the trial court committed no error in granting summary judgment to Assurance on Vernon's claim for money had and received.

3. Vernon further contends that the trial court erred in granting summary judgment to Assurance on his claim for fraud. Again, we disagree.

The essential elements of a fraud claim are: "(1) false representations made by the defendant, (2) which the defendant knew were false, (3) made with an intent to deceive the plaintiff, (4) justifiable and detrimental reliance by the plaintiff on such representations, and (5) damages suffered by the plaintiff as a result." *Chiaka v. Rawles*, 240 Ga. App. 792, 794-795 (2) (525 SE2d 162) (1999). "For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort." (Citation and punctuation omitted.) *Reeves v. Edge*, 225 Ga. App. 615, 618 (2) (484 SE2d 498) (1997).

Vernon asserts that in 2006, Neas and Thompson falsely represented to him that Assurance would pay him severance at the 5/15 percent rate on all jobs received prior to and during the severance period of 12 months. But Vernon has presented no

evidence that when Neas and Thompson made this alleged promise in 2006, they acted with the present intent not to perform.

> [T]he general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made. Otherwise, any breach of a contract would amount to fraud. An exception to the general rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place. Some evidence (beyond the mere failure to perform) must support a finding that the promise was made with a present intent not to perform. The absence of such additional evidence in the record here requires judgment in favor of the [Assurance] on this issue.

(Citations and footnotes omitted.) *Jonas v. Jonas*, 280 Ga. App. 155, 159-160 (3) (a) (633 SE2d 544) (2006).

Vernon also asserts that Neas and Thompson falsely represented to him in the Sales Commission Proposal that "[i]f this proposal is rejected, then [Vernon] will continue to be paid at the 15% rate for one year, as previously agreed." Vernon further asserts that Neas and Thompson, through the emails and severance checks sent to him after he rejected the Sales Commission Proposal, engaged in a fraudulent scheme to mislead him about the state of Assurance's business and the amount of

26

severance he would receive. However, Vernon has failed to show that he relied on these alleged misrepresentations and omissions to his detriment.

It is clear from Vernon's May 22, 2011 letter to Thompson that Vernon chose not to accept the new compensation structure set forth in the Sales Commission Proposal because he refused to accept any change in his pay unless and until he was making as much as Thompson, not because of any promise of future severance pay. Nor is there any evidence that Vernon was induced to take some action or refrain from some action based on the allegedly false emails and checks sent to him after he had rejected the Sales Commission Proposal and left Assurance. Indeed, Vernon requested additional supporting documentation shortly after he began receiving the checks and later demanded an accounting, reflecting that he had his doubts about whether the emails and checks were accurate. In the absence of evidence that Vernon relied to his detriment on these alleged fraudulent misrepresentations and omissions, Vernon's fraud claim failed as a matter of law, as the trial court properly concluded. See *Parrish v. Jackson W. Jones, P.C.*, 278 Ga. App. 645, 649 (2) (b) (629 SE2d 468) (2006).

27

4. Vernon also contends that the trial court erred in granting summary judgment to Assurance on his claim under Georgia RICO, OCGA § 16- 14-1 et seq. We do not agree.

The Georgia RICO statute provides that "[i]t is unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." OCGA § 16-14-4 (a). A "pattern of racketeering activity" means "[e]ngaging in at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions" that are interrelated.[9] OCGA § 16-14-3 (8) (A). "Racketeering activity" is defined as the commission of a crime in any of a number of specified categories of offenses, known as "predicate acts." OCGA § 16-14-3 (9) (A).

To assert a civil claim based on the Georgia RICO statute, the plaintiff must demonstrate that the statute has been violated, including that the defendant engaged in at least two predicate acts of racketeering activity. *Mays v. Askin*, 262 Ga. App.

---

[9] Incidents, schemes or transactions are "interrelated" where they "have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." OCGA § 16-14-3 (8) (A).

28

417, 422 (3) (585 SE2d 735) (2003). Furthermore, the plaintiff must suffer an injury "by reason of" a predicate act to recover under the statute, meaning that the plaintiff must prove that a predicate act was the proximate cause of his injury. See OCGA § 16-14-6 (c); *American Assoc. of Cab Companies v. Parham*, 291 Ga. App. 33, 39 (3) (c) (661 SE2d 161) (2008); *Mays*, 262 Ga. App. at 422 (3).

Vernon alleged that Assurance engaged in a pattern of racketeering activity through the commission of predicate acts of theft by deception, mail fraud, and wire fraud. Specifically, he alleged that sending him severance checks below the promised amount constituted theft by deception under OCGA § 16-8-3 (a); that sending him severance checks through the mail that were below the promised amount constituted mail fraud under 18 U.S.C. § 1341; and that sending him misleading emails about the severance checks and the state of Assurance's business during the severance period constituted wire fraud under 18 U.S.C. § 1343.

The trial court properly granted summary judgment to Assurance on the RICO claim to the extent that Vernon based his claim on theft by deception. "A person commits the offense of theft by deception when he obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." OCGA § 16-8-3 (a). Without reasonable reliance on a false representation, there can

be no deception, and "[w]ithout deception, of course, there can be neither theft by deception nor a valid RICO claim based upon theft by deception." *First Data POS v. Willis*, 273 Ga. 792, 795 (2) (546 SE2d 781) (2001). Here, there is no evidence that Vernon relied on the severance checks sent to him or was actually deceived by them. In fact, as noted supra in Division 3, Vernon requested additional supporting documentation shortly after he began receiving the checks and later demanded an accounting, reflecting his doubts about the accuracy of the checks. Under these circumstances, Vernon failed to prove the predicate act of theft by deception based on the submission of the severance checks as a matter of law.

With respect to the predicate acts of federal mail and wire fraud, it is true that a plaintiff is not required to prove "first-party reliance" to sustain a civil RICO claim; that is, the plaintiff is not required to prove that he himself reasonably relied on the alleged fraudulent misrepresentations of the defendant made by mail or wire. *Pollman v. Swan*, 314 Ga. App. 5, 6 (723 SE2d 290) (2011). See *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 650-653 (128 SCt. 2131, 170 LE2d 1012) (2008); *Pollman v. Swan*, 289 Ga. 767, 768 (1) (716 SE2d 191) (2011). But a plaintiff still must show proximate causation, namely, that a RICO violation "led directly to the plaintiff's injuries." (Citations and punctuation omitted.) *Pollman*, 314 Ga. App. at 7. And given

30

this proximate cause requirement, even though a plaintiff need not always prove "first-party reliance,"

> none of this is to say that a RICO plaintiff who alleges injury "by reason of" a pattern of mail [or wire] fraud can prevail without showing that *someone* relied on the defendant's misrepresentations. In most cases, the plaintiff will not be able to establish even but-for causation if *no one* relied on the misrepresentation.

(Emphasis in original.) *Pollman*, 314 Ga. App. at 6, quoting *Bridge*, 553 U.S. at 658.

There is no question of third-party reliance on any allegedly fraudulent misrepresentations made by Assurance in the severance checks or emails; the only party claiming misrepresentation and reliance is Vernon. "Accordingly, if [Vernon] did not rely upon the alleged misrepresentations, those misrepresentations could not be the proximate cause of injury, and summary judgment [was] appropriate." *Pollman*, 314 Ga. App. at 7. Here, as previously noted, there is no evidence that Vernon relied on the severance checks or the emails that accompanied them, and thus no evidence that the Vernon's alleged injuries were proximately caused by any alleged misrepresentations contained in those checks or emails. Id. at 7-8. Accordingly, the trial court did not err in granting summary judgment to Assurance on Vernon's RICO claim predicated on allegations of mail and wire fraud.

5. Lastly, Vernon contends that the trial court erred in granting summary judgment to Assurance on his claim for an equitable accounting under OCGA § 23-2-70. We do not agree.

"An accounting under [OCGA § 23-2-70] is not warranted if the accounts are not unusually complicated and an adequate remedy is available at law[.]" *Faircloth v. A.L. Williams & Assoc.*, 219 Ga. App. 560 (1) (465 SE2d 722) (1995). While Vernon asserts that the transactions at issue here are unusually complicated and intricate, his assertion is not supported by the record. Moreover, Vernon has a breach of contract claim for failure to pay him severance that came with the availability of extensive discovery. Under these circumstances, Vernon has an adequate remedy at law, and the trial court did not err in granting Assurance's motion for summary judgment on his equitable accounting claim. See id.

*Case No. A15A0307*

6. Assurance contends that the trial court erred in denying its motion for summary judgment on Vernon's claim for promissory estoppel. We disagree.

> The elements of the equitable doctrine of promissory estoppel are that the defendant made a promise upon which he reasonably should have expected the plaintiff to rely, the plaintiff relied on the promise to

32

his detriment, and injustice can be avoided only by enforcing the promise because the plaintiff forwent a valuable right.

*Thompson v. Floyd*, 310 Ga. App. 674, 682 (3) (713 SE2d 883) (2011). "Promissory estoppel does not apply to vague, indefinite promises." (Citation and punctuation omitted.) *Jones v. White*, 311 Ga. App. 822, 830 (2) (b) (717 SE2d 322) (2011).

Assurance argued in its motion for summary judgment that Vernon could not succeed on his promissory estoppel claim because the promise to pay Vernon severance was too vague and indefinite. But, as explained supra in Division 1, the combined evidence of record, construed in favor Vernon, would support a finding by a jury that the promise to pay Vernon severance was sufficiently definite to be enforceable. Consequently, the trial court committed no error in denying Assurance's summary judgment motion on the promissory estoppel claim.

7. Assurance further contends that the trial court erred in denying its motion for summary judgment on Vernon's claim for unjust enrichment. Again, we disagree.

A claim of unjust enrichment will lie if there is not legal contract and the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return or compensate for. The concept of unjust enrichment in law is premised upon the principle that a party cannot

33

induce, accept, or encourage another to furnish or render something of value to such party and avoid payment for the value received.

(Citations and punctuation omitted.) *Jones v. White*, 311 Ga. App. 822, 827-828 (1) (b) (717 SE2d 322) (2011).[10] Here, Vernon claimed that Assurance was unjustly enriched by its retention of a portion of the severance pay that it should have paid him for his work as a salesperson at the company.

Assurance argued in its motion for summary judgment that Vernon could not succeed on his unjust enrichment claim because Vernon did nothing to earn his severance pay, and thus did not confer a benefit upon Assurance. However, "the word 'benefit' denotes any form of advantage." (Citation and punctuation omitted.) *Jones*, 311 Ga. App. at 828 (1) (b). Here, as reflected by the evidence previously discussed, a jury could find that Vernon conferred a benefit upon Assurance by returning to work in 2006 after his "strike" over compensation and procuring additional lucrative clients for Assurance, including the client that led to Assurance's substantial work on

---

[10] A claim for unjust enrichment is unavailable where there is a legal contract addressing the obligations of the defendant to the plaintiff. See *Marvin Hewatt Enterprises v. Butler Capital Corp.*, 328 Ga. App. 317, 323 (4) (761 SE2d 857) (2014). But summary judgment should not be granted on that ground where, as here, a jury must resolve whether a contract existed between the parties. See *Ades v. Werther*, 256 Ga. App. 8, 9-10 (1) (567 SE2d 340) (2002).

the BP oil project. A jury could further find that this benefit was conferred after Assurance promised Vernon a new compensation package that included substantial severance pay in the event an impasse over compensation arose again in the future.

This combined evidence, when construed in Vernon's favor, would support a jury finding that Vernon returned to work in 2006 and provided Assurance with lucrative sales and marketing services in exchange for the promised severance, but that Assurance then retained a portion of the very severance that it had used to induce Vernon's continued employment. Accordingly, under these circumstances, summary judgment was properly denied on Vernon's claim for unjust enrichment. See *Jennings v. SSM Health Care St. Louis*, 355 S.W.3d 526, 536 (Mo. Ct. App. 2011) (failure to pay promised severance could support unjust enrichment claim). Compare *Rodriguez v. Vision Correction Group*, 260 Ga. App. 478, 479-480 (580 SE2d 266) (2003) (summary judgment properly granted on unjust enrichment claim where uncontroverted evidence showed that plaintiff was already reasonably compensated for her services).

*Judgment affirmed in part; reversed in part in Case No. A15A0306. Judgment affirmed in Case No. A15A0307. Ray and McMillian, JJ., concur.*

35