**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 20, 2017**

# In the Court of Appeals of Georgia

A17A0146. ROBERTS et al. v. SMITH.

BARNES, Presiding Judge.

Estelle Roberts and Charlie Smith appeal the trial court's rulings on cross-motions for summary judgment in this dispute over an arrangement among four siblings to purchase a home for the benefit of one of the siblings. The trial court ruled in favor of Mary Smith, the executor of the estate of Johnnie Smith, who was one of the siblings, on all claims. For reasons that follow, we reverse.

Summary judgment is proper "only if the pleadings and evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. OCGA § 9-11-56 (c)." (Citation and punctuation omitted.) *Vernon v. Assurance Forensic Accounting*, 333 Ga. App. 377, 378 (774 SE2d 197) (2015). On appeal from a grant or denial of summary judgment, we conduct a de novo review, "constru[ing] the evidence most favorably towards the nonmoving party, who is given the benefit of all reasonable doubts and possible

inferences." (Citation and punctuation omitted.) *Johnson v. Omondi*, 294 Ga. 74, 75 (751 SE2d 288) (2013).

The record shows the following undisputed facts. Estelle Roberts, Charlie Smith, Osie Outlaw, and Johnnie Smith, who is now deceased, are siblings.[1] In November 2011, Johnnie purchased a house in Cordele for $84,000 for the use of Osie and her husband. The appellants and Osie verbally agreed to contribute money toward the purchase and maintenance of the house. During their depositions, Estelle testified that "[n]obody had a set amount to pay," and Charlie explained that each sibling would do "[w]hatever was needed." When Charlie was asked, "Was there something more detailed about each of your responsibility?" he responded, "No, we are a family. So we don't sit down and say you put this amount, you put this amount. Whatever was needed we did." The appellants and Osie contributed toward the down payment, and Charlie later made one insurance and one tax payment and bought some doors for the house.

Johnnie was the sole buyer listed on the purchase agreement. He made a cash down payment of $11,136.49 and obtained mortgage financing from Atlanta Postal

---

[1] Estelle and Charlie will be referred to collectively as "the appellants" and individually by their names.

Credit Union ("APCU"), with which he already had a banking relationship, for the remainder. Johnnie was the only borrower listed on the promissory note and security deed. In January 2012, shortly after the closing, Johnnie executed a warranty deed transferring ownership of the Cordele property to the appellants and himself as joint tenants with rights of survivorship. He did not tell the appellants about this transfer until after the fact.

Johnnie arranged for the monthly mortgage payments to be automatically deducted from an account at APCU that he owned jointly with his wife, Mary.[2] According to the appellants' affidavits, Johnnie told them that he had set aside enough money in this account to pay the remaining mortgage balance. Neither appellant contributed toward the mortgage payments while Johnnie was alive.[3]

Johnnie died in December 2012, and Mary became the executor of his estate. According to Mary, and not refuted by the appellants, mortgage payments on the Cordele residence continued to be deducted automatically from Johnnie and Mary's joint APCU account for at least eight months after Johnnie's death.

---

[2] Johnnie created and funded the account with his own money before he married Mary. Mary was added to the account after their marriage.

[3] Osie sent Johnnie money to cover four mortgage payments in 2012.

In August 2013, Mary asked APCU to close all of Johnnie's accounts, including the joint account and an individual account that Johnnie owned with a balance of approximately $52,000. That same month, Mary told Estelle that Johnnie's accounts had been closed, and her lawyer sent the appellants a letter asking them to "take appropriate steps to refinance the mortgage indebtedness on the property and begin to pay the mortgage on the property." The appellants asked APCU for a pay-off amount and other details about the mortgage, but APCU refused to disclose any information to them. They also approached other banks in an effort to refinance the mortgage, but were rebuffed because their names did not appear on the loan documents. Finally, they tried to discuss the mortgage with Mary, but she would not tell them anything. Estelle made mortgage payments directly to APCU for the months of September 2013 through January 2014.

In September 2013, APCU notified Mary by letter that it had closed Johnnie's joint account at her request and reversed the mortgage payment that had been automatically deducted for that month. APCU also claimed in the letter that the mortgage loan was in default due to the reversed payment and because Johnnie's January 2012 transfer of the property by warranty deed had violated a provision of the security deed requiring pre-approval from APCU for any transfers. Accordingly,

APCU accelerated the loan and demanded full payment within 30 days. Soon thereafter, APCU seized the money in Johnnie's individual account and applied it toward the mortgage debt, claiming that it had a lien on the individual account under the terms of Johnnie's membership agreement with APCU. That left an outstanding mortgage balance of $14,661.64. The appellants were unaware of APCU's actions or communications with Mary.

In January 2014, APCU sent Mary notice that it was initiating foreclosure proceedings on the Cordele property because the mortgage loan remained in default due to lack of payment. After learning of this notice,[4] the appellants retained counsel to stop the foreclosure. The foreclosure did not occur, but the appellants were not told why. In fact, Mary averted the foreclosure by paying off the outstanding mortgage balance herself soon after receiving the foreclosure notice, and in return, APCU assigned the security deed and loan documents to Johnnie's estate. The appellants were not informed of this transaction.

In February 2014, the appellants filed a petition against Mary, in her capacity as executor of Johnnie's estate, seeking a judgment declaring the appellants to be the owners of the Cordele property, an order directing Mary to provide documentation

---

[4] Copies of the notice were mailed to the Cordele property.

5

for a pay-off amount on the mortgage, an accounting, and damages for emotional distress.[5] Mary answered and asserted counterclaims for judicial foreclosure, implied trust, and liquidated damages based on the appellants' breach of their alleged agreement to pay off the mortgage. With the trial court's permission, Mary later added Osie as a third party defendant and asserted those same claims against her.[6]

Mary and the appellants filed cross-motions for summary judgment. Following a hearing, the trial court entered an order granting Mary's motion and denying the appellants' motion. The court ruled that the appellants had no claim for failure to provide payoff information;[7] that they failed to establish a claim for emotional distress; that they breached an agreement to pay the mortgage on the Cordele property and that Mary was entitled to liquidated damages for that breach; that Mary also was entitled to judicial foreclosure and an implied trust on the property; and that the appellants were not entitled to cancellation or satisfaction of the loan documents. The appellants filed this appeal, challenging the trial court's rulings on the existence of

---

[5] The appellants also asserted claims against APCU, but later voluntarily dismissed them.

[6] Osie has not filed an answer or other responsive pleading.

[7] In their depositions, the appellants testified that Mary provided this information after they filed their petition.

an agreement to pay off the mortgage, implied trust, and satisfaction or cancellation of the loan documents.[8]

1. The appellants contend that the trial court erred by finding that they entered into an enforceable agreement to pay off the mortgage on the Cordele property. We agree.

"[T]he first requirement of the law relative to contracts is that there must be a meeting of the minds of the parties[.]" (Citation and punctuation omitted.) *Jimenez v. Gilbane Bldg. Co.*, 303 Ga. App. 125, 129 (693 SE2d 126) (2010). "[A] contract does not exist unless the parties agree on all the material terms. A contract cannot be enforced if its terms are incomplete, vague, indefinite, or uncertain." (Citation and punctuation omitted.) *McElvaney v. Roumelco, LLC*, 331 Ga. App. 729, 732-733 (1) (771 SE2d 419) (2015). Although "the law leans against the destruction of contracts on the ground of uncertainty," *Vernon v. Assurance Forensic Accounting*, 333 Ga. App. 377, 382 (774 SE2d 197) (2015) (citation and punctuation omitted), a contract

---

[8] Although the appellants do not enumerate as error the trial court's ruling on Mary's counterclaim for judicial foreclosure, they implicitly challenge that ruling in their claim of error that the trial court should have ruled that they were entitled to a cancellation or satisfaction of the loan documents. The appellants do not challenge the trial court's rulings on their claims for emotional distress, an accounting, and loan payoff information.

7

is not enforceable if "[i]t has not been shown, with any reasonable certainty, what the parties were obligating themselves to do." *Lemming v. Morgan*, 228 Ga. App. 763, 765 (1) (492 SE2d 742) (1997).

Mary claims that the appellants' failure to make continued mortgage payments after Johnnie's death "is a breach of their agreement with Johnnie, and they owe Johnnie's estate the entire amount of the balance due on the loan." Mary fails, however, to show that the appellants entered into any enforceable agreement to pay off the entire mortgage. It is undisputed that the appellants agreed, as Mary puts it, to "help [Johnnie] pay for [the house]." But "[n]obody had a set amount to pay"; rather, the siblings worked together as a family to do "[w]hatever was needed." The appellants and Osie contributed toward the down payment, but it was Johnnie who signed the purchase agreement, procured the mortgage, and arranged for the monthly mortgage payments to be deducted automatically from his bank account. The appellants averred that Johnnie told them he had set aside enough money in that account to cover the remaining mortgage balance. Neither appellant made any mortgage payments, nor any contributions to defray Johnnie's cost of paying the mortgage, while Johnnie was alive or for the eight months following his death. Ultimately, Estelle made four mortgage payments, but only after Mary told her that

Johnnie's accounts had been closed and Mary's lawyer asked the appellants to "begin to pay the mortgage on the property."

This evidence, which Mary has not refuted, does not show that the appellants agreed to be financially responsible for the mortgage payments on the Cordele property. In fact, the evidence does not show that the appellants committed to take *any* specific actions at all. There was no agreement that they would make financial contributions in any particular amount, at any particular time, for any particular obligation (i.e., mortgage payments, taxes, insurance, or maintenance). In short, the siblings' arrangement was too vague and ill-defined to constitute a legally enforceable contract.[9] Consequently, the trial court erred by ruling that the appellants breached a binding agreement to pay the mortgage on the Cordele property. It follows that the court also erred by ruling that Mary was entitled to liquidated damages for this asserted breach.

---

[9] In light of this conclusion, we do not reach the appellants' argument that the agreement is unenforceable under the statute of frauds because it was not in writing. See OCGA § 14-5-30. Additionally, to the extent that Mary argues that the contributions the appellants did make constitute partial performance rendering the agreement enforceable, "[p]erformance does not cure the deficiencies in an agreement that is so vague, indefinite, and uncertain as to make it impossible for courts to determine what, if anything, was agreed upon." (Punctuation and footnote omitted.) *Razavi v. Shackelford*, 260 Ga. App. 603, 605 (1) (580 SE2d 253) (2003).

9

2. The appellants contend that the trial court erred by imposing an implied trust on the Cordele property in favor of Johnnie's estate because there is a legal presumption, which Mary failed to rebut, that Johnnie's contributions to the property for the benefit of his siblings were gifts that did not grant him or his estate a beneficial interest in the property. Mary asserts that this gift presumption does not apply to the kind of trust she seeks to establish and that, in any event, Johnnie's contributions were not gifts.

An implied trust may be either a resulting trust or a constructive trust. OCGA § 53-12-2 (5); see also *Robertson v. Robertson*, 333 Ga. App. 864, 872 (2) (778 SE2d 6) (2015). A resulting trust is defined, in relevant part, as

> a trust implied for the benefit of the settlor or the settlor's successors in interest when it is determined that the settlor did not intend that the holder of the legal title to the trust property also should have the beneficial interest in the property under any of the following circumstances: . . . (3) A purchase money resulting trust as defined in subsection (a) of Code Section 53-12-131 is established.

OCGA § 53-12-130.[10] A purchase money resulting trust is a "trust implied for the benefit of the person paying consideration for the transfer to another person of legal title to real or personal property." OCGA § 53-12-131 (a). The payment of this consideration "shall create a presumption in favor of a resulting trust, but such presumption shall be rebuttable by a preponderance of the evidence." OCGA § 53-12-131 (b). However, if the person who pays the consideration and the person to whom the property is transferred "are husband and wife, parent and child, or siblings, a gift shall be presumed, but such presumption shall be rebuttable by clear and convincing evidence." OCGA § 53-12-131 (c); see also *Brock v. Brock*, 279 Ga. 119, 120 (1) (610 SE2d 29) (2005) (discussing gift presumption). Applying this principle here, the appellants contend that the estate is not entitled to the benefit of a trust because Mary has not rebutted the familial gift presumption.

Mary maintains that she sought a constructive trust, not a resulting trust. A constructive trust "is a trust implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of

_____

[10] Subsections (1) and (2) of OCGA § 53-12-130 involve, respectively, trusts that are created, but fail, and trusts that are fully performed without exhausting all the trust property. Neither scenario is present here.

11

equity." OCGA § 53-12-132 (a). "[S]ometimes it is exceedingly difficult to differentiate between the two [types of implied trusts]; but ordinarily distinctions are unnecessary since both are implied trusts and are governed by the same rules." *Hancock v. Hancock*, 205 Ga. 684, 690 (1) (54 SE2d 385) (1949). The distinction may be important here, however, as the familial gift presumption appears to apply only to purchase money resulting trusts, not to constructive trusts. Compare OCGA § 53-12-131 (defining purchase money resulting trusts and setting forth familial gift presumption) with OCGA § 53-12-132 (defining constructive trusts without mentioning a familial gift presumption).

In her counterclaim, Mary alleged that "[t]he Estate is entitled to have the Court impose an *implied purchase money trust* on the Cordele property for the benefit of the Estate." (Emphasis supplied.) The trial court ruled that Mary was entitled to an "implied trust" for the benefit of the estate, without specifying whether that implied trust was resulting or constructive. And in their appellate briefing, the parties simply assert that the potential trust at issue here falls into the category of their choice, without discussing how the facts of this case fit into the statutory definitions cited above. Even if we assume for purposes of this appeal that Mary's counterclaim was for a constructive trust, she was not entitled to summary judgment on that claim.

12

"[A] constructive trust is a remedy created by a court in equity to prevent unjust enrichment. . . . As such, it is not an independent cause of action, but a device by which property might be recovered if an unjust enrichment claim were to prevail." (Citations and punctuation omitted.) *Reeves v. Newman*, 287 Ga. 317, 318 n.2 (695 SE2d 626) (2010); see also *Ansley v. Raczka-Long*, 293 Ga. 138, 141 (3) (744 SE2d 55) (2013). "Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." (Citation and punctuation omitted.) *Tuvim v. United Jewish Communities*, 285 Ga. 632, 635 (2) (680 SE2d 827) (2009). On appeal, Mary explains her theory of recovery on the trust counterclaim as follows: "Since Johnnie paid for and provided financing for the Cordele property, equity requires that Johnnie's estate have the beneficial interest in the Cordele property"; otherwise, the appellants will receive "a windfall."

Unjust enrichment, however, does not apply when the conferred benefit was a gift or voluntary payment. See *Estate of Crook v. Foster*, 333 Ga. App. 36, 39-40 (1) (775 SE2d 286) (2015) ("[O]ne who makes a gift or voluntarily pays money which she knows she does not owe confers a benefit, but she is not entitled to restitution."

13

(punctuation and footnote omitted)); see also *Stoker v. Bellemeade, LLC*, 272 Ga. App. 817, 819 (1) (615 SE2d 1) (2005), overruled in part on other grounds, *Bellemeade, LLC v. Stoker*, 280 Ga. 635 (631 SE2d 693) (2006). Thus, even if the appellants do not enjoy the benefit of the familial gift presumption applicable to purchase money resulting trusts, they nevertheless may defeat Mary's trust counterclaim by demonstrating that Johnnie's contributions to the Cordele property were gifts or voluntary payments.

The record shows without dispute that Johnnie bought the Cordele property, procured the mortgage, and had the monthly mortgage payments automatically deducted from his bank account. He took these actions so that his sister and her husband could live in the house. Johnnie later transferred the property to himself and the appellants, but he did not consult the appellants before executing the warranty deed. Further, the appellants testified that Johnnie told them that he had set aside enough money to pay off the mortgage balance. This evidence was sufficient to raise a question of fact as to whether the financial contributions by Johnnie and his estate to the Cordele property were, at least in part, gifts or voluntary payments not required to be repaid. See *Estate of Crook v. Foster*, 333 Ga. App. at 40 (1). The trial court therefore erred by granting summary judgment to Mary on her trust counterclaim.

14

3. The appellants argue that they were entitled to summary judgment in their favor because Mary's payoff of the mortgage resulted in a cancellation or satisfaction of the loan documents, rather than an assignment of those documents to Johnnie's estate. The appellants rely on *Walker v. Neil*, 117 Ga. 733 (45 SE 387) (1903), in which the Supreme Court held that "[w]here money due on a mortgage is paid by one whose duty it is, by contract or otherwise, to pay the mortgage, it is a release, though in form it purports to be an assignment." (Punctuation omitted.) Id. at 741 (5), citing *Clay v. Banks*, 71 Ga. 363 (1884). The appellants maintain that Johnnie had a legal duty to pay the mortgage, pursuant to the loan documents, and this duty passed to his estate upon his death. See OCGA § 53-7-40 (6) ("Unless otherwise provided by law, all property of the estate, both real and personal, shall be liable for the payment of claims against the estate in the following order: . . . (6) Judgments, secured interests, and other liens created during the lifetime of the decedent . . ."). Once the estate paid off the mortgage, the appellants reason, the debt was satisfied and the loan documents were legally cancelled.[11]

---

[11] See OCGA 44-14-3 (b) (2), which provides: "Whenever the indebtedness secured by any instrument is paid in full, the grantee or holder of the instrument, within 60 days of the date of the full payment, shall cause to be furnished to the clerk of the superior court of the county or counties in which the instrument is recorded a legally sufficient satisfaction or cancellation to authorize and direct the clerk or clerks

15

Mary, on the other hand, argues that the loan documents were properly assigned to the estate under the doctrine of equitable subrogation. That doctrine "provides that where it was the intent of the parties to substitute a new creditor's rights for the rights of the creditor that is being paid off, the new creditor steps into the shoes of the old creditor in terms of priority." (Citation and punctuation omitted.) *Kim v. First Continental Bank*, 326 Ga. App. 424, 426 (1) (a) (756 SE2d 655) (2014). The trial court agreed with Mary, ruling that her "claims and rights to foreclose on the Cordele Property are protected by the doctrine of equitable subrogation."

But equitable subrogation does not apply where the entity paying off the obligation is itself a debtor on the obligation. See *Johnson v. AgSouth Farm Credit*, 267 Ga. App. 567, 568-569 (2) (600 SE2d 664) (2004). In her appellate brief, Mary asserts – without explanation – that the scenario of a debtor paying off a loan "is not the case here." But as noted in Division 1, the appellants had no enforceable contractual duty to pay the mortgage, whereas – by virtue of signing the loan documents – Johnnie did. And under *Walker v. Neil*,

> [i]f the money is advanced by one whose duty it is, by contract or otherwise, to pay and cancel the mortgage and relieve the mortgaged

to cancel the instrument of record."

16

premises of the lien, a duty in the proper performance of which others have an interest, it shall be held to be a release, and not an assignment, although in form it purports to be an assignment.

(Citation and punctuation omitted.) 117 Ga. at 741 (5).

The trial court did not address *Walker*, and Mary does not attempt to distinguish it in her appellate brief; she simply suggests that it is inapplicable because it is an old case. But *Walker* remains good law, and we are bound by it. See *Financial Education Svcs. v. State of Ga.*, 336 Ga. App. 606, 608 (785 SE2d 544) (2016) (Court of Appeals "has no authority to overrule or modify a decision made by the Supreme Court of Georgia, as the decisions of the Supreme Court shall bind all other courts as precedents" (citation and punctuation omitted)). Accordingly, the appellants were entitled to cancellation or satisfaction of the loan documents, and the trial court erred by ruling otherwise.

4. In light of our ruling in Division 3, it was error for the trial court to dismiss the appellants' petition.

*Judgment reversed. McMillian and Mercier, JJ., concur.*