Filed 10/03/24



VERMONT SUPERIOR COURT

Addison Unit
7 Mahady Court
Middlebury VT 05753
802-388-7741
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 23-CV-01214

> Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

## Ruling on Middlebury's Motion for Summary Judgment
## and Renewed Motion to Dismiss

In 1914, former Vermont Governor John Mead offered to give Middlebury College the financial resources to construct a chapel on its campus. Middlebury accepted, and the chapel, named the Mead Memorial Chapel, was completed within 2 years. He died in 1920, and his estate was promptly probated and closed. In 2021, Middlebury determined to remove the Mead name from the chapel and removed the signage so describing it. The Rutland Probate Division, on petition, then reopened Governor Mead's estate and appointed former Vermont Governor James Douglas its special administrator for the purpose of bringing this lawsuit. Here, Governor Douglas challenges Middlebury's decision to remove of the Mead name from the chapel. Governor Douglas claims that, in changing the chapel's name, Middlebury breached a term in an alleged contract between Governor Mead and Middlebury or, in the alternative, it breached a condition-subsequent burdening Governor Mead's gift to Middlebury to the effect that the chapel would be known perpetually as the Mead Memorial Chapel. He also claims that Middlebury breached the covenant of good faith and fair dealing inherent in the original contract or is liable for unjust enrichment.

In its August 4, 2023, decision denying Middlebury's motion to dismiss, the court rejected Middlebury's argument that Governor Douglas necessarily lacks "standing" to prosecute this action. It then concluded that it could not determine based on the allegations of the complaint alone whether the 1914 transaction sounds in contract or property (gift) law. The court summarized the law as to perpetual contract terms and conditions-subsequent binding gifts—both highly disfavored under the law—but made no final determinations as to those matters under Rule 12(b)(6), preferring to let the evidence develop first.

After document discovery was complete, Middlebury filed a motion for summary judgment and a renewed motion to dismiss for lack of standing.[1] It argues as follows: (1) Governor Mead's contribution in support of the chapel was a gift rather than a contract; (2) there is no perpetual naming condition-subsequent attached to that gift, and if there

---

[1] Depositions, which would not be anticipated to reflect on the issues addressed in this decision, are conditionally stayed under the court's July 23, 2024, order.

were, it is not enforceable by Governor Douglas because no reversionary right was retained by Governor Mead; (3) separately, Governor Douglas lacks "standing" to raise any rights related to the gift because such claims can only be prosecuted by Vermont's Attorney General; (4) even if the transaction is construed to be a contract, the evidence falls short of demonstrating that there is any naming condition running to perpetuity; (5) because there is no contract, there can be no breach of the covenant of good faith and fair dealing; and (6) the circumstances of this case cannot support an unjust enrichment claim.

The court notes that, excepting Middlebury's objection to the court's analysis of donor-standing law, the parties assert now no disagreement with the court's description of the law in the dismissal decision, which the court adopts for purposes of this decision. But for donor-standing, there is no fundamental disagreement as to the applicable legal principles. The controversy is how the law properly applies to the circumstances of this case.

*Procedural standard*

Summary judgment procedure is "an integral part of the . . . Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Morrisseau v. Fayette*, 164 Vt. 358, 363 (1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Summary judgment is appropriate if the evidence in the record, referred to in the statements required by Rule 56(c), shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. V.R.C.P. 56(a); *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994) (summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial). The court derives the undisputed facts from the parties' statements of fact and the supporting documents. *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 29, 175 Vt. 413. A party opposing summary judgment may not simply rely on allegations in the pleadings to establish a genuine issue of material fact. Instead, it must come forward with deposition excerpts, affidavits, or other evidence to establish such a dispute. *Murray v. White*, 155 Vt. 621, 628 (1991). Speculation is insufficient. *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375.

*The Facts*

The parties take issue with certain of each other's characterizations of facts, and they draw different inferences, but the record is purely documentary, historical, and undisputed in all material respects. The parties, Governor Douglas in particular, have set forth the narrative at length. The court summarizes here.

John Abner Mead (1841–1920) was a physician, businessman, politician, and philanthropist who served as Vermont's Lieutenant Governor from 1908 to 1910 and as Vermont's Governor from 1910 to 1912. He graduated with the Class of 1864 from

Middlebury College, which was chartered in 1800. In 1914, he determined to give Middlebury the funds to construct a campus chapel. Accordingly, on May 11, 1914, he sent the following letter (the 1914 Letter) to Middlebury's President, the Rev. Dr. John M. Thomas:

My Dear President Thomas:-

In commemoration of the 50th anniversary of my graduation from Middlebury College, and in recognition of the gracious kindness of my heavenly father to me throughout my life, I desire to erect a chapel to serve as a place of worship for the college, the same to be known as the "Mead Memorial Chapel." I have in mind a dignified and substantial structure, in harmony with the other buildings of the college, and expressive of the simplicity and strength of character for which the inhabitants of this valley and the State of Vermont have always been distinguished.

It was my great-great-grandfather, the first white settler of this valley, who brought the first copy of the Holy Bible into this unbroken wilderness and it was his wife, my great-great-grandmother, who gathered her large family about her in an indian wigwam for the first christian service of the Vermont pioneers of this immediate region.

With this memory ever present, it has been my hope and prayer that I might be able and permitted to build for this college a suitable place for divine worship and that it might rise from the highest point on its campus as a symbol of the position, most prominent in every respect, which Christian character and religious faith should always maintain in its work for our youth.

I have in mind the furnishing of from $50,000 to $60,000 for the erection of such a structure, and I hereby suggest that the Trustees of the College secure appropriate plans for its erection which shall meet with my approval, and that said board appoint a building committee at once, consisting of president Thomas, former President Brainerd and myself to make the necessary contracts for such a structure and to supervise the erection of the same, and I will then bind myself and my estate to provide the necessary means for its erection and completion in accordance with the suggestions of this letter and with the contracts to be made by your committee.

President Thomas sent a copy of the 1914 Letter to the Trustees of Middlebury College requesting replies "as to whether you will authorize the acceptance of Governor Mead's proposition and the appointment of the Building Committee which he suggests." The Trustees responded enthusiastically with approval.

On June 22, 1914, the Board of Trustees met and resolved as follows:

The following resolution, introduced by Dr. Brainerd, on motion of Dr. Barton & Prof. Kellogg, was adopted by a rising vote:-

Whereas our esteemed colleague, the Honorable John Abner Mead of the Class of 1864, has signified to President Thomas his desire, in commemoration of the fiftieth anniversary of his graduation, to erect a Chapel for Middlebury College, and his readiness to furnish the sum of from fifty thousand to sixty thousand dollars for the erection of such an edifice,

Resolved that the President and Fellows of Middlebury College hereby accept of this magnificent benefaction with sincere gratitude to both Dr. & Mrs. Mead and their family for their deep interest in the religious welfare of the College, so impressively manifested by this provision of a suitable place for divine worship.

Resolved that the Trustees through the Committee nominated by Dr. Mead will use their best endeavors to secure the erection of a dignified and substantial structure, in harmony with the other buildings of the college, and such as will meet the approval of the donor."

Dr. Mead made fitting response to this resolution. His letter of presentation follows in full:-

[A copy of the 1914 Letter then appears here, but it is unnecessary to repeat at length and is omitted.]

On motion of Mr. Partridge, seconded by Dr. Abernathy, the Building Committee for the Mead Chapel was elected as above, Messrs. Thomas, Brainerd, Mead and Weeks.

Mr. Collins of the architectural firm of Allen & Collins then appeared before the Board with tentative plans for the new Chapel, which were discussed at length.

A groundbreaking ceremony was held on June 23, 1914. In his remarks, Governor Mead said:

On this date, I wish to break the ground and place the corner stone for this Memorial Chapel, with the hope and prayer that there shall be a sacred duty resting upon each, to make this Holy Temple, so soon to be erected, an instrument of great good to those of this generation and to those who may follow after.

The Rev. James Barton then delivered the Acceptance in Behalf of the Trustees, which included this:

> It is doubly gratifying to me, as it is to the Board of Trustees, that this building, as a memorial, will bear the name of one so long and so honorably connected with this institution and who in the state and nation has always upheld and promoted true piety and civic and national righteousness.

> This chapel will provide for the generations of students and faculties of this college that to which the other buildings cannot minister. To this place all will turn in order to experience the reality of the unseen, to satisfy the thirst of the soul for God.

> We then, the Trustees of this College, on behalf of ourselves and our successors, in the name of the generations of students it will serve, in full recognition of the supreme importance of such a religious center to the life of the institution, and in loving memory of him whose name this structure is to bear, gratefully accept at your hand this Chapel as we pledge ourselves to safeguard to the limit of our capacity the gift and the ideals it is intended to perpetuate.

Professor Charles Wright then gave an Address in Behalf of the Faculty, which included this:

> The Faculty thank you, Governor Mead, from profoundly grateful hearts. You have bodied forth our dream of years; you have given to an airy nothing a local habitation—and not the least of our pleasure is the thought that through all the days to be it will bear your honored name.

By December 1914, the ensuing planning had made clear that the expense of construction would exceed $60,000, the high end of the originally contemplated range. Middlebury agreed to complete construction if Governor Mead would contribute the full $60,000. Governor Mead in January 1915 agreed:

> In consideration of the contract of the Committee for the Erection of the Mead Memorial Chapel at Middlebury College with Thomas W. Rogers of Brandon, Vt., whereby the same is to be erected in accordance with plans and specifications of Allen & Collens, architects, at a cost of $51,945, I agree to furnish funds for the discharge of this contract and for the expenses connected with the erection of this chapel, to the amount of $60,000, as may be required during the construction and in accordance with the terms of the above contract, binding myself, my heirs and my assigns as above specified. It is agreed on the part of said Trustees that they are to complete said

chapel, making it complete in every way, as to grounds, furnishings, etc., for the purposes of a college chapel, as voted at the meeting of the Trustees of said college held in New York City Dec. 18, 1914, and as defined in correspondence between the president of Middlebury College and myself.

By April 1915, Governor Mead had committed another $1,031 for certain windows and pilasters, and Middlebury had agreed to contribute another $5,000 for a pipe organ. In June 1915, Governor Mead agreed to contribute an additional $6,960 for a "chime of bells." Governor Mead eventually approved the final architectural plans, all reflecting that the chapel would bear the Mead Memorial Chapel name. While construction was underway, Governor Mead attended the Building Committee's meetings, met with architects, approved project designs, controlled the budget, and paid labor and materials expenses.

Construction of the Mead Memorial Chapel was complete in 1916. Governor Mead died in 1920. From inception to present, the chapel has been an important place on campus "where the College community comes together on occasions of significance."

In this history, Governor Douglas sees a contract between Governor Mead and Middlebury with a term requiring that the chapel remain named the Mead Memorial Chapel into perpetuity. Middlebury instead sees a gift from a generous benefactor not burdened by any such condition, much less a perpetual one.

*Was it a gift or a contract?*

Determining whether Governor Mead's contribution of funds for the construction of the chapel was a gift to or contract with Middlebury is to determine whether the claimed naming condition is properly analyzed under those property law concepts applicable to gifts or contract law. The court declined to resolve that issue at the dismissal stage, noting that the distinction is potentially subtle and would be better addressed on a developed factual record.

The parties have not disagreed with the applicable law as summarized in the dismissal decision, which the court briefly summarizes. "To be a gift, a transfer must be made with donative intent. The requirement of donative intent is the essence of a gift." Restatement (Third) of Property (Wills & Don. Trans.) § 6.1 cmt. b. "Donative intent is to be distinguished from donative motive. The motive for making a gift is a complex matter and does not determine whether or not a gift was intended. The relevant criterion is intent to transfer an ownership interest gratuitously, as opposed to engaging in an exchange transaction or making an involuntary transfer." *Id.* "[A] gift is not ordinarily treated as a bargain, and a promise to make a gift is not made a bargain by the promise of the prospective donee to accept the gift, or by his acceptance of part of it. *This may be true even though the terms of gift impose a burden on the donee as well as the donor. In such cases the distinction between bargain and gift may be a fine one, depending on the motives manifested by the parties*." Restatement (Second) of Contracts § 71 cmt. c

23-CV-01214 Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

(emphasis added); see also *id*. § 24 cmt. b ("[P]roposal of a gift is not an offer within the present definition [of offer]; there must be an element of exchange. Whether or not a proposal is a promise, it is not an offer unless it specifies a promise or performance by the offeree as the price or consideration to be given by him. It is not enough that there is a promise performable on a certain contingency.").

Middlebury argues that the undisputed facts can support one inference only: that the transaction was a gift as a matter of law: Governor Mead's intentions were donative in nature, even if he imposed conditions precedent, and even if he contemplated a specific name for the chapel. Governor Douglas sees in those conditions the sort of bargained-for consideration that instead points in favor of a contract with an enduring condition.

As the Restatement (Second) of Contracts § 71 cmt. c says, the distinction the parties are asking the court draw can be "a fine one." The court does not believe the record is so one-sided as Middlebury does and declines to rule as a matter of law. The issue must be determined on the evidence at trial.

*If it was a gift, is there an enforceable naming condition?*

If it is assumed for present purposes that the transaction was a gift, and that the gift was burdened by some condition-subsequent as to the name of the chapel, the question then turns to whether the condition could be enforceable in a case such as this. See *Wilbur v. University of Vt.*, 129 Vt. 33, 43 (1970) ("Beyond that, we do not interpret the restriction as imposing a true condition subsequent. Such a construction is disfavored."); *President & Fellows of Middlebury Coll. v. Cent. Power Corp. of Vt.*, 143 A. 384, 390 (Vt. 1928) ("Furthermore, conditions subsequent are not favored in the law, and if the language of an instrument can be otherwise construed, without violating the plain intent of the maker thereof, it will be done.").

Generally, to work a forfeiture in the donee, the donor must have clearly retained a right of forfeiture or reverter. See *Wilbur,* 129 Vt. at 44 ("The absence of any provision for forfeiture or reverter is a strong indication that the donor did not contemplate a failure of the ultimate purpose of his gift."); Restatement (Second) of Property, Don. Trans. § 31.2; Iris J. Goodwin, Donor Standing to Enforce Charitable Gifts: Civil Society v. Donor Empowerment, 58 Vand. L. Rev. 1093, 1145 (2005) ("[N]early all the modern American authorities—decisions, model acts, statutes, and commentaries—deny a donor standing to enforce a restricted gift to [a] public charity absent express retention of a reversion in the donative instrument.").

The record reveals no such reversionary right retained by Governor Mead. In opposition to summary judgment, Governor Douglas argues at page 51 as follows:

> In the case at bar, if the court determines that there was no consideration, the gift was delivered and accepted by the donee. However, there were conditions on the gift which have now been breached. Removing

the Mead sign violated Mead's approval of the plans and specification of the Chapel as well as the condition that the chapel "be known as" "Mead Memorial Chapel." The stripping of the name was a canceling of the College's performance of an essential condition of the gift. Whether the obligation was undone or never performed, the result is the same, the donor is entitled to restitution.

But he nowhere points to any evidence in the record documenting Governor Mead's retention of any reversionary rights triggered by such circumstances. Without any such right having been reserved, even if there were some condition placed on a gift of funds for construction purposes, it would be unenforceable in the manner urged by Governor Douglas in this case.

Middlebury thus is entitled to judgment as a matter of law to the effect that if the transaction is determined to have been a gift, any naming condition attached to that gift is not enforceable in this case. It is unnecessary to further resolve Middlebury's donor-standing argument vis-à-vis the attorney general's exclusive authority.

### *If it was a contract, is there a perpetual naming condition?*

If it is assumed for present purposes that the transaction was a contract, the question turns to whether that contract includes a term requiring that the chapel retain the name Mead Memorial Chapel into perpetuity. As the court explained in the dismissal decision, perpetual terms in contracts are disfavored and must be shown with *adamant clarity*—ambiguity will be construed against perpetuity. See Ruling on Middlebury's Motion to Dismiss at 5–6 (filed Aug. 4, 2023); *McDonald v. Scitec, Inc.*, 79 A.3d 374, 379 (Me. 2013) ("'Forever' is a long time." (citation omitted)).

The record reveals no naming term with perpetual duration. Governor Douglas argues at pages 36–37 of his opposition filing as follows:

It is the trust that Mead had with his fellow trustees and their shared understanding that a promise to name a building as a memorial to honor and remember ancestors, was a promise forever. Moreover, this was a religious chapel that was to memorialize the Mead ancestors who embodied and symbolized the "simplicity and character of the inhabitants" of the area and the removal of the Mead name is a breach of a sacred promise that was made through the prayers and dedications offered to the Mead Memorial Chapel and Governor Mead.

And we can suppose it is that trust, that prevented the insertion of some sort of language such as "in perpetuity" with regard to the name Mead Memorial Chapel. However, there is no evidence to suggest that "in perpetuity" language was even being used at that time and place in history. Therefore, we have absolutely no evidence to suggest that it would have

ever occurred to the parties, to specify that a name in quotation marks with the verbiage "the same to be known as", would have only temporary effect for some finite time period. A name is a name is a name.

And then at 42 he says this:

> The 2021 removal of Mead family name from the Mead Memorial Chapel was a breach of the contract's most essential term, the consideration expected by and bargained for by John Abner Mead, that the chapel he was erecting for the college would be a memorial to his ancestors, bearing his family name forever. Given the evidentiary record already assembled, could any reasonable person actually believe that the Trustees did not agree to name the chapel the "Mead Memorial Chapel" or that Mead would have built the chapel if his term or condition were denied?

In other words, there is no direct evidence of any such perpetual requirement, and Governor Douglas instead would have the court infer that such a requirement was intended by the parties based on the general circumstances of the transaction. The standard, however, is rigorous, and the evidence as extensively assembled by Governor Douglas does not satisfy it.

Nor can the matter be settled rhetorically by the hypothetical question as to what would have happened if Middlebury in 1914 responded to Governor Mead's offer by saying yes to the money but no to the name. Obviously, Governor Mead and Middlebury both contemplated at the time that the chapel as built would be named the Mead Memorial Chapel, and it in fact was. It is likely the case that neither contemplated in 1914 that Middlebury ever would be interested to switch course and change the name many generations later. But the legal question is whether there is adamantly clear evidence in the record of a naming condition running to perpetuity that binds Middlebury. The evidence is insufficient. There is no such *perpetual* condition.[2]

*Assuming it was a contract, was there any naming condition at all?*

Middlebury's argument that there was no naming condition whatsoever, however, is not persuasive. Here, Governor's Douglas's thought experiment is compelling. The record is express that both parties intended that the chapel would be named the Mead Memorial Chapel. There is no evidence of any negotiated duration attached to that name. However, the court has no doubt that if Middlebury had resisted placing the Mead name on the chapel at the time of the offer that the offer would have been retracted. That the chapel would be named the Mead Memorial Chapel was a condition to the offer. That so naming the as-built structure would satisfy that condition, as though Middlebury was free immediately thereafter the change the name, strains

---

[2] Governor Douglas's speculation that the terms *perpetual* or *perpetuity* may not have been in common use in the early 1900s for these purposes is not the point. The question is not whether this or that special word was used but whether any words were clearly used to impose a durational term extending forever.

23-CV-01214 Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

credulity.

Generally, "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204; *Gade v. Chittenden Solid Waste Dist.*, 2009 VT 107, ¶ 26 n.7, 187 Vt. 7 ("General principles of contract law . . . add further support for the implication of a reasonable time limit in a contract where no time limit is provided. When a contract lacks a term essential to its performance, the court may supply a reasonable term, based on the subject matter of the contract.").

No doubt, Governor Douglas's view is that a reasonable time is as long as the chapel is standing. But that is no different than imposing the perpetual durational term that the law disfavors, that the evidence does not support, and that maximizes the chance of a forfeiture.

The parties have not identified, and the court has not unearthed, any case in which a contract between a private person and a charity for the construction of a building that is burdened with a naming condition that lacks a durational term, and the court is left to say what length is reasonable. The most instructive case cited in the briefing and that the court has found is *St. Mary's Medical Center, Inc. v. McCarthy*, 829 N.E.2d 1068 (Ind. Ct. App. 2005). In that case, the terms of Ms. Cornelia Haney's will directed substantial funds to a bank in trust for the establishment of the Haney Memorial at St. Mary's Medical Center. Ms. Haney died shortly thereafter, and trust funds were used to construct a chapel at the hospital. Approximately 50 years later, the hospital determined that its expansion plans required demolition of the chapel. Daniel McCarthy, a distant relative of Ms. Haney, filed suit to enjoin the demolition. For appeal purposes, the Court assumed without deciding that Mr. McCarthy had standing to bring suit. *Id.* at 1072.

The Court first determined that the will did not contemplate the creation of a charitable trust. It then explained that the argument in support of a charitable trust amounted in the alternative to a claim of a defeasible condition-subsequent to the gift. *Id.* at 1075 ("That is, he seems to contend that the devise is revocable should St. Mary's want to destroy the chapel at any time before it collapses of its own accord after an indeterminate period of use."). From there, the Court analyzes the disfavored nature of conditions-subsequent and the reasonable duration of any such condition that lacks an express durational provision. The decision is worth quoting at length:

Here, given the disfavor of conditions subsequent and the absence of clear reverter language or the required length of any Haney Memorial created by Haney's estate, the most that can be said of her devise to St. Mary's through her trust committee was that she and the committee expressed confidence in St. Mary's that it would "use the property so far as may be reasonable and practicable to effect the purpose of the grant." Indeed, the Chapel of Mary, Queen apparently was an integral part of St.

Mary's for nearly fifty years, until such time as the hospital's governance decided that it was no longer practicable for the chapel to remain and, in fact, was an impediment to expansion of the hospital. *We will not second-guess the reasonableness of St. Mary's determination on this point.* We also note that although charitable gifts should be encouraged so far as possible, charities themselves should not be bound to one particular use of bequeathed property for multiple generations unless they are on clear notice that such is a requirement of the bequest. [Fn. 4]

> [Fn. 4]   There was evidence presented here that the Chapel of Mary, Queen could stand for another fifty to seventy-five years, if not longer. McCarthy essentially asserts that St. Mary's must allow the chapel to stand for at least that long; the wording of the trial court's order also would seem to require St. Mary's to do nothing that might hasten the chapel's demise and that it would have to wait until the chapel crumbled of its own accord before it could put the property on which it stands to another use. We decline to so hold in the absence of clear evidence that St. Mary's knew it was irrevocably tying up a substantial piece of its grounds for at least 100 to 125 years when it agreed to use the funds from Haney's estate to build the chapel.

In any event, there are Indiana cases suggesting that St. Mary's use of the chapel for nearly fifty years constituted substantial compliance with any charitable trust or condition subsequent imposed by Haney's will. For example, in [one case], the court considered the effect of a donation of real estate to a township with the condition that it be used for school purposes. The opinion holds that even if this represented a valid condition subsequent, which the court doubted, the township substantially complied with the condition by using the property for school purposes for thirty years and that it could then sell the property. . . . [In another case . . .,] the decedent bequeathed $2,000 and real estate to his brother, which pursuant to the will the brother promised to use to build a library and hall for the benefit of a church organization. Apparently, the brother died twenty years after the library and hall were built and his heirs sought to recover the property over the objections of the church organization. This court first expressed skepticism that the brother was intended to hold the property in trust for the church organization. We went on to hold that even if there had been a trust, "the purposes of the bequest were fully carried out by the erection of this building of which plaintiffs had the use and benefit for nearly 20 years, and it does not appear that they are still entitled to its use and benefit. . . .

. . . . [E]ven if there was a charitable trust or valid condition subsequent, St. Mary's use of the chapel for nearly fifty years represents substantial compliance with any such trust or condition.

*Id.* at 1076–1077 (citations omitted, emphasis added).

In short, at issue in St. Mary's was not merely the use of a memorial chapel but the very existence of it. The Court clearly determined that, even if there were a condition-subsequent binding the gift that paid for the chapel's construction, that condition was clearly satisfied by the passage of around 50 years, and the Court would "not second-guess the reasonableness" of the hospital's judgment as to demolition of the chapel.

By contrast, the use of the chapel in this case is not at issue, only its name, and the chapel retained its original name for well over 100 years, and approximately 100 years after Governor Mead's own death. Governor Mead contributed most of the funds supporting the initial construction of the chapel, but he did not provide funds for its indefinite maintenance, and Middlebury has determined that the time has come to change the name. In these circumstances, the court concludes that the reasonable duration of any contractual term as to the name of the chapel has been satisfied as a matter of law.

Governor Douglas's breach of contract claim fails as a matter of law.

*Breach of the covenant of good faith and fair dealing*

Assuming the transaction was a contract, Governor Douglas's claim based on the covenant of good faith and fair dealing remains in the case. The Vermont Supreme Court has described the implied covenant as follows:

> The covenant of good faith and fair dealing is implied in every contract; its boundaries, however, are contextual and fact-specific. It is an implied promise that protects against conduct which violates community standards of "'decency, fairness or reasonableness.'" "A cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties. . . ." A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different conduct.

*Harsch Properties, Inc. v. Nicholas*, 2007 VT 70, ¶ 14, 182 Vt. 196 (citations omitted). The court understands Governor Douglas's claim to address not the chapel's name-change per se but the manner by which Middlebury undertook it. In Governor Douglas's view, Middlebury unjustly tarnished Governor Mead's reputational interests in violation of the covenant.

Middlebury argues that there can be no viable claim predicated on the covenant insofar as there is no contract in which any such covenant is implied. As the court has not determined whether the transaction in this case was a gift or a contract, the court

cannot rule on that issue at this time. Otherwise, Middlebury has not sought judgment on the substance of the claim.

*Unjust Enrichment*

Middlebury argues that Mr. Douglas's unjust enrichment claim fails as a matter of law based on the circumstances of this case. Governor Douglas did not respond to that argument in his opposition filing. The court construes Governor Douglas's silence as a waiver and consent to judgment in Middlebury's favor on this claim.

In any event, the claim has no merit. In the complaint, Governor Douglas describes this claim as follows: "Under these facts and circumstances, it is unjust for the Defendant to strip the Mead Memorial Chapel of the Mead Family name, canceling the incredible accomplishments and altruism of a true philanthrope and important figure in Vermont history, all while retaining the many benefits that the Mead Memorial Chapel has provided to every student who has attended Middlebury College for the last century and will to the next, without commensurate compensation."

As a general matter, "Unjust enrichment is present only if: '(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value.'" *Kellogg v. Shushereba*, 2013 VT 76, ¶ 31, 194 Vt. 446 (citation omitted).

As in most cases, the first two elements usually are satisfied: a benefit was conferred on Middlebury, and Middlebury accepted it. The real question is the equitable one as to whether Middlebury should retain the benefit. But Mr. Douglas nowhere explains why it would be inequitable for Middlebury to retain the benefit in the circumstances of this case. As the Restatement explains, "Unjustified enrichment is enrichment that lacks an adequate legal basis; it results from a transaction that the law treats as ineffective to work a conclusive alteration in ownership rights. Broadly speaking, an ineffective transaction for these purposes is one that is *nonconsensual*." Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. b.

Whatever the proper characterization of the underlying transaction, Governor Douglas's unjust enrichment theory does not fit the facts. If there was a contract, there can be no claim for unjust enrichment. See *id.* § 2 ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."). "Unjust enrichment . . . does not apply when the conferred benefit was a gift or voluntary payment." *Roberts v. Smith*, 801 S.E.2d 915, 921 (Ga. Ct. App. 2017).

*Summary and Related Matters*

Accordingly, the court is unable to determine at this time whether the underlying

23-CV-01214 Hon. James H. Douglas, Special Administrator of the Estate of John Abner Mead v. The President and Fellows of Middlebury College

transaction was a gift or a contract. Either way, Governor Douglas, on behalf of the Estate, would not be entitled to relief compelling Middlebury to retain the chapel's original name or monetary relief compensating the name change. The unjust enrichment claim has no merit. Because the transaction still could be determined to be a contract, the court cannot determine as a matter of law that there can be no claim on the covenant of good faith and fair dealing.

There thus remain two issues in this case to be resolved at trial: (1) is the transaction a gift or contract; and (2) if a contract, has Middlebury breached the covenant of good faith and fair dealing, the only claim remaining that could give rise to a remedy and, if so, what damages, if any, is the plaintiff entitled to recover.

Regarding further proceedings, the court understands that the evidence material to the first issue, though requiring a finding of fact, is essentially the same as described in this decision. Evidence material to the second issue, on the other hand, can be expected to explore deeply emotional and politicized matters, all of which will have been unnecessary to reach if the determination on the first issue is that the transaction was a gift and thus there can be no covenant claim. For that reason, any trial in this case will be bifurcated so that the first issue may be resolved before evidence necessary to the second may be presented. See V.R.C.P. 42(b).

Regarding the covenant claim, the briefing of both the dismissal and summary judgment motions has only summarily touched on the substance of the claim.[3] Because the court has determined that Middlebury is entitled to summary judgment on the breach of contract claim, contract damages will not be available in this case, even if the court ultimately determines that the parties intended a contract rather than a gift. Tort damages, however, are available to a party who proves a breach of the covenant of good faith and fair dealing. See *Monahan v. GMAC Mort. Corp.*, 2005 VT 110, ¶ 54 n. 5, 179 Vt. 167 ("cause of action for the breach of the implied covenant of good faith and fair dealing is one sounding in tort"); *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, 161 Vt. 200, 208 (1993) ("an action for [breach of the covenant of good faith and fair dealing] is really no different from a tort action"); but see *Harsch Properties, Inc. v. Nicholas*, 2007 VT 70, ¶ 17, 182 Vt. 196 ("Although claims for breach of the implied covenant take on many qualities of a tort action, these claims are not fully and exclusively torts."). Relevant examples might include damages for emotional distress or for harm to one's reputation. The court notes, however, that Governor Mead has been deceased for over a century and could not have been emotionally harmed by Middlebury's decision to remove the Mead name from the chapel. The court needs to know, therefore, what damages Governor Douglas claims to be entitled to recover in this case if he prevails on the breach of the covenant of good faith and fair dealing claim. The court will give Governor Douglas 30 days to file a brief listing the kinds of damages he intends to seek to recover and explaining the legal basis supporting the entitlement to recover such damages here. The court will give Middlebury 30 days to respond.

---

[3] Certain discovery bearing on the covenant claim is stayed at this point. See *supra* n.1 at 1.

## Order

For the foregoing reasons: (1) Middlebury's motion for summary judgment is granted in part and denied in part; (2) Middlebury's renewed motion to dismiss is denied as moot; (3) the parties shall submit further briefing as set forth above; and (4) depositions will remain stayed under the July 23, 2024, order pending further order of the court.

SO ORDERED this 3rd day of October, 2024

_____

Robert A. Mello
Superior Judge